## No. 15,736.

Lewis *v.* The People.
(174 P. [2d] 736)

Decided November 18, 1946.

Mr. Joel E. Stone, for plaintiff in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Mr. James S. Henderson, Assistant, for the people.

*En Banc.*

Mr. Justice Jackson delivered the opinion of the court.

Plaintiff in error, who was the defendant in the trial court, was convicted of conspiracy to commit false pretenses and was sentenced to a term in the penitentiary of not less than two and not more than five years. He comes here requesting that his writ of error issued herein operate as a supersedeas and that the case be determined on the supersedeas application. We have elected so to dispose of it.

The information filed against defendant charged that on June 17, 1945, in Denver, he did then and there "unlawfully and feloniously agree, conspire, confederate and cooperate to and with some person or persons to the district attorney aforesaid unknown, falsely and maliciously to do, and to aid in the doing of, and to aid in the doing by them, or some one or more of them, cooperating with each other, at the City and County of Denver, and State of Colorado, of an unlawful act, to wit: a felony, which felony was to obtain from Virginia Van Pelt, various sums of money of a value in excess of Twenty Dollars of the moneys and personal property of the said Virginia Van Pelt, by means and by use of false pretenses, with intent to cheat and defraud the said Virginia Van Pelt. * * * "

The evidence in the case is undisputed. Four wit-

nesses appeared for the people. The defendant neither took the stand in his own behalf nor did he offer any evidence. The testimony of the complaining witness, Miss Van Pelt, was that at the time of the trial she was twenty-four years of age and unmarried; that on June 14, 1945, she was living in an apartment on East Seventeenth Avenue, and was employed in the downtown business district; that at about 6:30 in the evening of that day she received a telephone call at her apartment in which the person calling, a man, asked if that was her correct address and if the girls in the apartment still lived there; that he then gave a description of the complaining witness and asked if she knew the girl he was describing. She answered, "I guess that was me." He thereupon advised her that he had a client who had pictures of her in the nude, and that it would cost her "around $150 to get them back." In answer to her request, he refused to tell who was calling or whom he represented. She denied the existence of any such pictures, but he maintained that his client had them and that he would give her one week to think it over. At approximately the same hour the following day, June 15, the same man called her again and asked her to meet him at a vacant house about two houses away on Seventeenth Avenue. He stated that he wanted to talk to her and "tell her more about it;" she refused to meet him, but he told her not to bring her boy friend with her, and that it would not be necessary for her to bring any money because he only wanted to talk to her. In further conversation he stated that if she failed to meet his demands he would place the photographs under the doors of the apartments in the house in which she lived and also take them down to the office where she worked. She repeated the denial of the existence of such pictures, but thought that it might have been possible to have obtained a picture of her face and "by amateur photography create the pictures that the caller claimed were in the possession of his client." When she refused to

make an appointment to meet the man, he asked her to wait a moment until he could talk to his client. She then heard a conversation at the other end of the line between the person who had been talking to her and some third party, but was unable to understand what was said. She subsequently spent the remainder of the evening in the company of her friend, John K. Banks, whose testimony also appears in the record. The latter stated that he took the complaining witness home at approximately two o'clock Saturday morning, at which time he saw defendant in the neighborhood of the apartment and had some conversation with him. He described the clothes worn by the defendant and at the time he gave his testimony definitely identified defendant as the man he saw on Seventeenth Avenue at about two o'clock on the morning of June 16th. The complaining witness further testified that at about 2:15 in the morning of June 16th someone came to the apartment house, repeatedly knocked on her door and called her by name. Her roommate opened the door and ordered the person so knocking to leave. Nevertheless he stood on the porch for some time, and the complaining witness was able to observe that he was dressed in the same kind of clothes as those worn by defendant when he was seen by her friend, Banks, a few minutes earlier. This visitor subsequently departed from the premises, but later that morning, Saturday, June 16, about 9:30 o'clock, the same man, whom she identified by the voice, called her over the telephone and said "he noticed that I hadn't met him the night before like I was supposed to, and that he would have to send a young colored fellow over to see me to convince me that I was into it as deeply as these other people. He claimed this young fellow was in the same predicament that I was, and I told him not to send anyone over, and he said he would come himself, and hung up."

After this conversation the complaining witness notified the Denver police and was instructed that if the

person called again, to make an appointment with him and then notify the police so that the latter could render her the proper protection. She testified that at about 9:30 Saturday evening defendant did call again. She refused to make an appointment for Saturday night but, having notified the police, she and her roommate walked to the near-by drugstore as the speaker had directed, waited there for about fifteen minutes, and then returned to their apartment. The defendant did not make his appearance at that time. On Sunday morning the owner of the same voice called again, and this time the complaining witness agreed to meet him, as he requested, at Seventeenth Avenue and Marion Street, where he told her to bring the money, which she agreed to do. She then called the police, went to the appointed place and waited for the defendant to appear. She saw a man across the street and, as he walked in the opposite direction, he apparently made some sort of signal by holding up both of his hands. After she had walked about a block, the defendant crossed the street toward her (he having walked around the block), and when he had come up to her he stopped and said, "I see that you made it but there is too many spectators." Before he could make any further statement he was placed under arrest by police officers, who had been trailing him, and taken to the police station. The complaining witness also accompanied the police officers to the station and while there listened to defendant's voice over an extension telephone while he was talking to a person whom he claimed was his mother. The complaining witness recognized his voice as that of the man who had been calling her, and made this identification without any qualification or question whatsoever.

The testimony of a police officer confirms that part of the story which involves the apprehension of defendant and the conversations between complaining witness and the police. The police officer also stated that defendant at all times refused to make any kind of a state-

ment; that on his way to the police station, while in the car and after his arrest, he produced an envelope, tore it up, and attempted to throw it away. The pieces were subsequently recovered. The envelope was a plain white one, addressed to "D. L. S. L. [the initials of the defendant] 929 East 23 Ave., Denver, Colorado," and had three one cent stamps on it.

The testimony of the janitor of the apartment house where the complaining witness roomed was to the effect that, preceding the events related above, defendant was seen in the vicinity of Miss Van Pelt's apartment; that he had made inquiries of the janitor concerning her, and that he had attempted to enter her apartment. A visit by the police to the address appearing on the envelope torn by the defendant revealed that defendant had a room at that address. A pair of "pink or orange" trousers was found there, which fitted the description of those worn by defendant when seen by Banks and the complaining witness.

No objection was made to any of the court's instructions to the jury, and counsel for the defendant, admitting that defendant was guilty of moral turpitude, assigns eleven alleged errors as grounds for reversal. These are grouped under three propositions: (1) That no conspiracy was proven; (2) that if a conspiracy did exist it was not a conspiracy to commit false pretenses; and (3) that the trial court committed error in admitting evidence of the telephone conversations, detailed above, over the objection of defendant's counsel.

 1. Counsel for defendant maintains that sufficient evidence of a conspiracy was not introduced to satisfy the legal principles which have been established in this jurisdiction, and relies upon the following cases: *Chilton v. People,* 95 Colo. 268, 35 P. (2d) 870; *Grandbouche v. People,* 104 Colo. 175, 89 P. (2d) 577; *Moore v. People,* 31 Colo. 336, 73 Pac. 30; *Clark v. People,* 78 Colo. 120, 239 Pac. 1025; *Rollins v. Commissioners,* 15 Colo. 103, 25 Pac. 319; *Smaldone v. People,* 103 Colo. 498, 88 P.

(2d) 103. Two federal cases also are cited, *Martin v. United States,* 100 F. (2d) 490; *Worthington v. United States,* 64 F. (2d) 936. The attorney general answering, admits the principles of conspiracy laid down in these cases. As stated by the court in *Martin v. United States, supra,* "The essence of the crime of conspiracy is two or more persons combining and confederating with the intent and purpose of committing a public offense by doing an unlawful act or doing a lawful act in an unlawful manner.". While generally, and in the instant case, it is permissible, in charging the crime of conspiracy, to allege that one of the participants is unknown, the existence of another acting in concert and cooperation must clearly appear from the evidence. *Worthington v. United States, supra.* In the instant case it appears from the uncontradicted evidence of the complaining witness that defendant stated that it was a client of his, and not himself, who was in possession of the pictures; that it was the client, and not himself, who would turn them over to her for a consideration of $150. When defendant refused to tell the complaining witness who his client was, it was he who asked her to hold the line "until I talk to my client," and the complaining witness thereupon heard the defendant engage in conversation with some third person, to her unknown, without being able to understand what was said in that conversation. Defendant in a subsequent conversation with Miss Van Pelt referred to the fact that he would have to send a young colored fellow over to convince her. It was the very words and acts of the defendant, wholly uncontradicted by him or anyone else in the trial, that formed the basis for this charge of conspiracy. Although there was no obligation upon him to take the stand in his defense, by failing to do so he subjected himself to inferences unfavorable to him which the jury was at liberty to, and evidently did, draw from the evidence. *Martinez v. People,* 63 Colo. 347, 166 Pac. 241; *Blanda v. People,* 67 Colo. 541, 189 Pac. 249; *Gould v. People,* 89 Colo. 596,

5 P. (2d) 580; *O'Loughlin v. People,* 90 Colo. 368, 10 P. (2d) 543; *Allison v. People,* 109 Colo. 295, 125 P. (2d) 146. We believe that the evidence in this case is sufficient to support the jury's verdict that defendant was guilty of conspiracy as charged.

2. It next is asserted that there were no false pretenses in this case; that false pretenses to constitute a crime must be adapted to induce the person to whom they are made to part with something of value; citing *People v. Orris,* 52 Colo. 244, 121 Pac. 163. That the pretense must be calculated to deceive according to the ability or capacity of the person to whom it is made to detect the falsehood; citing *Clarke v. People,* 53 Colo. 214, 125 Pac. 113. It is then pointed out that in the instant case the complaining witness was not deceived; that in her testimony she stated that she told defendant that there were no pictures of her in the nude in existence, and that she had nothing to worry about. With the exception of the statement that the defendant possessed photographs of the complaining witness in the nude, his other statements deal with his intention to do something in the future; that fraud cannot be predicated upon a false intention; citing *Farris v. Strong,* 24 Colo. 107, 48 Pac. 963, but must relate to a past or existing fact; citing *Morton v. People,* 73 Colo. 576, 216 Pac. 703.

The statement, however, that he possessed photographs of the complaining witness in the nude is a representation of a past or existing fact, and, as will be noted, the complaining witness testified that even though she was confident that there were no such authentic pictures of her in existence, nevertheless defendant might, by what she describes as amateur photography, have a likeness of her face or head superimposed upon a picture of the nude torso of some other woman. Under the evidence in this case, therefore, false pretenses could be found to exist, regardless of whether defendant had no such genuine photographs as he represented or whether he had some that were faked.

█ The third contention is that the telephone conversations with complaining witness are inadmissible because they were· hearsay, unless the evidence establishes beyond a reasonable doubt the identity of defendant as a party to those telephone conversations. Counsel cite 20 Am. Jur., pages 334, 336, sections 366, 368; and also quote from annotations on the subject of telephone conversations as evidence, 105 A.L.R. 326.

In the A.L.R. annotations, we find the following which announce the principle which we believe should control in the instant case:

"The meat of the rule as to the admissibility of evidence of a telephone conversation is said in State v. Silverman (1934) 148 Or. 296, 36 P. (2d) 342, to have been well stated, as shown in annotation in 71 A.L.R. 7, quoting from 1 R.C.L. p. 477, as follows: 'Communications through the medium of the telephone may be shown in the same manner, and with like effect, as conversations had between individuals face to face. But the identity of the party against whom the conversation is sought to be admitted must be established by some testimony either direct or circumstantial . . . Slight circumstances will suffice for this purpose, however; * * *' [105 A.L.R. 327]

"In New York L. Ins. Co. v. Silverstein (1931; C.C.A. 8th) 53 F. (2d) 986, the court said: * * * 'Where a face-to-face conversation between a witness and another person would be admissible in evidence, a conversation between such persons over the telephone is admissible, provided the identity of the person with whom the witness speaks is satisfactorily established. Proof of identity is usually established by the witness's recognition of the voice of the person with whom he speaks. But the identity of the speaker may be established by other means, * * *' [105 A.L.R. 328]

"In Re Dreyfus [1923] S. Austr. S.R. 75, it was said that a telephone conversation may be admissible in evidence not only in case the speaker's voice was recog-

nized by the witness during the conversation, but where the conversation was referred to by the other party in a subsequent letter or conversation as having been had, or where the witness was able from subsequently hearing the speaker's voice in his own presence to recognize it again, or the speaker subsequently acted in a manner reasonably explicable only on the assumption that the telephone conversation had taken place. [105 A.L.R. 335]"

The instant case presents, not an isolated call over the telephone, but, as appears from the uncontradicted testimony of the complaining witness, a series of calls made by the voice of the same person with the conversation pertaining to the same subject matter; a voice that was subsequently identified as belonging to the defendant by the complaining witness after listening in, as the defendant telephoned from the police station. Not only is the party to the telephone conversation identified as defendant by direct evidence, but by considerable circumstantial evidence which is high-lighted by a series of calls by the same voice, together with the fact that the defendant was at the place designated in the telephone conversation at which the complaining witness was to meet him, and the further fact that the very first words spoken at the place of meeting made reference to an arrangement for a meeting that was in accordance with directions previously given over the telephone. For the foregoing reasons, we believe the evidence in regard to the telephone conversations was properly admitted.

The judgment is affirmed.