# No. 24137

## Edward John Husar and Norman James Kohn v.
## The People of the State of Colorado
(496 P.2d 1035)

Decided May 15, 1972.

Hindry, Erickson & Meyer, William H. Erickson, Charles F. Brega, for plaintiffs in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Aurel M. Kelly, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

Edward John Husar and Norman James Kohn were found guilty of conspiracy to commit grand theft and were sentenced to the penitentiary. A third person, Gerald David Gimm, jointly charged as a co-conspirator with the defendants, entered a plea of *nolo contendre* to the charge of attempt to commit grand theft and his conviction is not before us.

I.

Husar and Kohn are here by writ of error seeking a reversal

of their convictions. The principal error relied upon for reversal is the sufficiency of the evidence to support the verdict of guilty. Although there was direct evidence as to Gimm's participation in the conspiracy, the evidence against the two defendants here is primarily circumstantial. We find the evidence to be sufficient to sustain the verdict and no errors sufficiently prejudicial to require reversal.

The prosecution evidence was mainly through Mrs. Eileen Varner, the intended victim of the conspiracy. In describing a pattern with which law enforcement agencies are familiar, Mrs. Verner related how she was first contacted by telephone by a man who represented himself to be a state bank examiner investigating discrepancies in various banks in Boulder. After learning from Mrs. Varner where she had her bank accounts, the alleged examiner told her she would be contacted by a Mr. Grimes, whom Mrs. Varner knew to be one of the bank officials. Within a few minutes she received a second call from one claiming to be Mr. Grimes, but Mrs. Varner stated she recognized the voice as being the same as the man who made the initial call. "Mr. Grimes" entreated Mrs. Varner to give her assistance to him and outlined a plan whereby she was to withdraw funds from her account, ostensibly to aid in the investigation of some irregularities at the bank.

Mrs. Varner agreed, but then alerted the police before undertaking to carry out the instructions given her. Thus, the police were able to conduct a surveillance, both near the bank while Mrs. Varner was there and at Mrs. Varner's home, where she was to take the withdrawn funds and to await further instructions.

The one co-conspirator Gimm was arrested by a detective who had secreted himself in Mrs. Varner's home. Gimm came to the house after Mrs. Varner arrived from the bank, representing himself to be a Mr. Conners, a Pinkerton detective. Almost immediately upon Gimm's arrival, there was a telephone call—again from the person who had initially given the instructions to Mrs. Varner—during which Mrs. Varner was told to give the money to Gimm. The caller also

asked to speak to Gimm on the telephone, and thus his connection with the caller was established.

Kohn's implication in the transaction stems from a number of circumstances. When Mrs. Varner was at the bank, she had occasion to see, and to hear the voice of, a man who passed close to her when she was at the teller's window and who stationed himself as though to be waiting for someone at a distance of about twenty feet from her. She identified the voice of the person in the bank as the same one who had made all of the telephone calls to her home. She also identified this person as Kohn from photographs shown her on Kohn's driver's license.

Husar's connection with the conspiracy was established through other circumstantial evidence sufficient to submit the matter to the jury. While the police were conducting the surveillance at the bank during Mrs. Varner's visit there, they noted a black Lincoln sedan which was conspicuously cruising the area. This same sedan was later seen cruising near Mrs. Varner's home when she returned there from the bank. Gimm was observed to have made some kind of hand signal to the driver of the sedan. The police stopped the sedan and arrested the driver, who was Husar. In the back seat of the car, there was a billfold with two driver's licenses issued to Kohn—one containing a photo of Kohn. The description of Kohn on the driver's license matched the description of the man seen by one of the police as a passenger in the back seat of the sedan when it was first observed in the vicinity of the bank.

## II.

The defendants assert that the trial court erred in not striking the testimony of Mrs. Varner, because it was hearsay and because the identification of the voice of Kohn was insufficient as a matter of law. Complaint is also made because the voice identification was not brought out on the direct examination of the witness, but upon cross-examination. A further attack is made upon the identification testimony because the statement prepared by a clerk at the

police station, the same day as the event, did not record the identification.

The defendants recognize *Lewis v. People,* 115 Colo. 434, 174 P.2d 736, as controlling authority on the issue, but argue that since the circumstances here are not as conclusive as to the identification as they were in *Lewis,* that the Varner identification does not come within the rule. Conceding, for arguments sake, that the circumstances supporting the identification of Kohn may not be as conclusive as in *Lewis,* nevertheless the principle applies. *Lewis* is not limited in its application to situations where the circumstantial evidence of identity is the same or stronger than that with which the court was dealing in *Lewis.*

■ In *Lewis,* the defendant relied upon some cases annotated in 105 A.L.R. 326. This court in response made this statement:

"In the A.L.R. annotations, we find the following which announce the principle which we believe should control in the instant case:

'The meat of the rule as to the admissibility of evidence of a telephone conversation is said in *State v. Silverman* (1934) 148 Or. 296, 36 P.(2d) 342, to have been well stated, as shown in annotation in 71 A.L.R. 7, quoting from 1 R.C.L. p. 477, as follows: "Communications through the medium of the telephone may be shown in the same manner, and with like effect, as conversations had between individuals face to face. But the identity of the party against whom the conversation is sought to be admitted must be established by some testimony either direct or circumstantial. . . . Slight circumstances will suffice for this purpose, however;* * *" [105 A.L.R. 327]

'In *New York L. Ins. Co. v. Silverstein* (1931; C.C.A. 8th) 53 F. 2d 986, the court said: * * * "Where a face-to-face conversation between a witness and another person would be admissible in evidence, a conversation between such persons over the telpehone is admissible, provided the identity of the person with whom the witness speaks is satisfactorily established. Proof of identity is usually established by the

witness's recognition of the voice of the person with whom he speaks. But the identity of the speaker may be established by other means,* * *" [105 A.L.R. 328]

'*In Re Dreyfus* [1923] S. Austr. S.R. 75, it was said that a telephone conversation may be admissible in evidence not only in case the speaker's voice was recognized by the witness during the conversation, but where the conversation was referred to by the other party in a subsequent letter or conversation as having been had, or where the witness was able from subsequently hearing the speaker's voice in his own presence to recognize it again, or the speaker subsequently acted in a manner reasonably explicable only on the assumption that the telephone conyersation had taken place. [105 A.L.R. 335]' "

In *Morgan v. Brinkhoff,* 145 Colo. 78, 358 P.2d 43, this court said:

". . .It has been held not to be error to admit the testimony of a witness 'as to his conversation over the telephone with a man whose voice he subsequently recognized as the voice of the defendant'; any significance to be attached to such circumstances relates to 'its weight [rather] than its competency.' *People v. Strollo,* 191 N.Y. 42, 83 N.E. 573; *see Kent v. Cobb,* 24 Colo. App. 264, 133 Pac. 424." *See also Small v. People,* 173 Colo. 304, 479 P.2d 386.

Appropriate to the issue is the statement of this court in *Bingham v. People,* 157 Colo. 92, 401 P.2d 255:

"We hold that the court did not err in denying Bingham's motion for acquittal. There was evidence identifying Bingham as being one of the participants in the robberies. We have said the identity is provable circumstantially by the height and by clothes worn by the accused. *Thompson v. People,* 139 Colo. 15, 336 P.2d 93. The cited case concerned the identity of defendants whose heads and faces were covered by women's mesh stockings at the time they committed the robbery. 'The uncertainty of identification goes to its weight rather than to its admissibility.' *People v. Spinuzzi,* 149 Colo. 391, 369 P.2d 427." *See also: Bingham v. People, supra.*

## III.

The balance of defendants' assignments of error, which require discussion, may be lumped under the general heading of "Insufficiency of the evidence to support the convictions." Coupled with this broad proposition is the argument that the telphone conversations were hearsay of an alleged conspirator without any evidence establishing the conspiracy.

Circumstances which tend to corroborate the voice identification of Kohn include his presence in the Great West Bank during the time Mrs. Varner was ostensibly carrying out his telephonic instructions; his reference to her large sunglasses in a telephone conversation with Mrs. Varner after his observation of her in the bank; and the resumption of telephone calls almost immediately following Mrs. Varner's return home from the bank.

There are many circumstances tying both Husar and Kohn to the conspiracy. Kohn informed Mrs. Varner of the fact that both "bank examiners" and "Pinkerton men" were working together in Boulder because of the discrepancies in the several banks. Gimm came to her house to establish the fact. After Mrs. Varner's return from the bank, the "Pinkerton man" reappeared to pick up the $4,500 which Mrs. Varner had withdrawn from the bank pursuant to Kohn's instructions, and Kohn insisted that "Conners" identify himself again to Mrs. Varner and verify his identity with Kohn by getting on the telephone.

Husar, under police surveillance, was first seen in the black Lincoln on the street two blocks from the Varner house. At this time Gimm was at the Varner residence. The Lincoln was coming from the direction of her house. There were two individuals in the car. The driver was Husar and a passenger in the rear seat. Within a few minutes the car retraced its route on College Avenue just about the time that Gimm was leaving the Varner house. Gimm was walking west on College Avenue, having just crossed Lincoln Street, when Husar came abreast of him and honked the horn. Gimm acknowledged the horn signal by waving, then reversed his course and proceeded north on Lincoln Street.

The presence in the car driven by Husar of Kohn's billfold, without any explanation, is a strong circumstance tying Husar and Kohn together.

Finally, the time element lends credence to the fabric of circumstantial evidence in this case. To recapitulate, Mrs. Varner testified that she was first called at 11:30 or 11:40 a.m. She estimated the time of her call to the police at 12:05 p.m. Shortly thereafter Gimm arrived. As Gimm left at approximately 12:20 or 12:25 p.m., the black Lincoln, driven by Husar and carrying a man having a description similar to Kohn's was observed in the vicinity of Mrs. Varner's house. Mrs. Varner went to the bank at 12:30 and observed Kohn. At this time the Lincoln occupied only by Husar was twice observed in the vicinity of the bank. Mrs. Varner returned to her house, arriving at 12:45 or 12:50 p.m. She then spoke again with Kohn. Immediately thereafter Husar was arrested in the black Lincoln across the intersection from Mrs. Varner's home. Thus, the entire sequence of events took place in a period of less than two hours. Given this context, the jury could properly infer that the sum of circumstances was more than mere coincidence.

We have repeatedly held that proof of a conspiracy may be fashioned from evidence other than that the parties came together and actually agreed upon a method of operation for the accomplishment of the offense. If it be shown that the defendants pursued, by their individual acts, the same objective, one performing one part and the other different parts of the common scheme so as to accomplish it, the existence of a conspiracy may be inferred by the jury. *Bingham v. People,* 157 Colo. 92, 401 P.2d 255; *Griffin v. People,* 157 Colo. 72, 400 P.2d 928; *Medina v. People,* 154 Colo. 4, 387 P.2d 733; and *Smaldone v. People,* 103 Colo. 498, 88 P.2d 103.

Neither of the defendants testified in his own behalf, nor did they offer any evidence in defense of their innocence. Such being the case, they are not in a position to complain when the jury draws warranted inferences from the People's evidence which leads to a guilty verdict. *DeBaca v.*

*People,* 160 Colo. 543, 418 P.2d 286; *Schamber v. People,* 159 Colo. 102, 410 P.2d 514. The jury is permitted to draw any and all reasonable inferences of guilt from the evidence before it. *Schamber v. People, supra.*

■ The jury was fully justified in its finding of guilt as to both defendants on the basis of the evidence presented by the prosecution.

The judgment is affirmed.

District Judges EDWARD J. BYRNE* and GEORGE V. KEMPF* participating.

District Judge EDWARD J. BYRNE dissenting.

MR. JUSTICE GROVES and MR. JUSTICE ERICKSON not participating.

*District Judges sitting under assignment of the Chief Justice under provisions of article VI, section 5(3) of the constitution of Colorado.