## Richmond

RAYE O. LAWSON v. COMMONWEALTH OF VIRGINIA.

RAYE O. LAWSON v. COMMONWEALTH OF VIRGINIA.

March 7, 1960.

Record Nos. 5070, 5071.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*George B. Dillard* and *Barry N. Lichtenstein*, for the plaintiff in error.

*Thomas M. Miller, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

A grand jury in the trial court returned two indictments against the defendant, Raye O. Lawson, each containing two counts. One

indictment charged him with forging and uttering a check for $100, and the other with forging and uttering a check for $400, Code § 18-26. On his trial to a jury, the two cases being heard together, he was found guilty on both indictments and sentenced to two years in the penitentiary on each, the sentences to run concurrently. We granted him a writ of error to determine his complaint that the Commonwealth's evidence was not sufficient to sustain either of his convictions.

Both of the checks were made by J. W. King, Broker, to the order of Rachel L. Taylor. Her name was endorsed by Lawson on the back of each check and immediately under her name he signed his own name and wrote his address. He cashed both checks and received the money. The issue is whether the evidence offered by the Commonwealth proved beyond a reasonable doubt that he had no authority from Mrs. Taylor to do so.

The Commonwealth called Mrs. Taylor as its witness to furnish the essential proof of defendant's lack of authority to endorse her name on the checks. She was obviously a reluctant witness and many of her answers were in response to leading questions. The material parts of her testimony may be stated as follows:

She had a contingent interest in some property in Roanoke owned by her husband, from whom she had been divorced. J. W. King, a broker, was effecting a sale of the property and had offered $100 for the release of her interest. Prior to that time Mrs. Taylor had been employed part time in Lawson's office doing secretarial work over a period of about two years. She engaged Lawson to take care of the matter and he was able to secure an offer of $500 for her interest. He communicated this offer to her in Maryland; she came to Roanoke, signed the contract of sale, and on August 13, 1958, went with Lawson to King's home where Lawson delivered the contract while she waited in the car. At that time King delivered to Lawson the $100 check payable to Rachel L. Taylor. Soon afterwards a deed for the property was executed and delivered and on August 21, 1958, King gave to Lawson the additional check for $400, payable to Rachel L. Taylor.

As stated, Lawson endorsed the name of Rachel L. Taylor on each of these checks and got the money but did not tell her that he had received either the checks or the money. For two weeks after the contract was signed she did not work for Lawson but after that period she went back and continued working for him until about November 7, and in that period she asked Lawson

several times about the money she was to receive and he would tell her that the deal had not gone through "or something or another." In November she found out from King that the transaction had been completed and he showed her the two checks which had been paid to Lawson on or within a day or two after their dates.

Mrs. Taylor was then asked, "Did you ever authorize or tell anyone that they could sign your name to these checks?" She replied, "Well, I imagine he was taking care of the matter. I felt that he probably should have. * * * He probably should have signed them if I owed him the money."

Again the Commonwealth's attorney asked, "State whether or not you ever authorized anyone, or did you give anyone the power or the authority to sign your name to these checks?" Again she answered, "Well, Mr. Crush, I authorized him to look into this matter by going there and taking care of it and I imagine it would all pertain to the same thing." She explained that Lawson advised her that the $100 offer for her interest was too small and when due to his efforts it was increased to $500 it was understood between them that they would divide that sum. After she signed the contract he gave her $70 at one time and $30 at another, but she did not then know this was money from the sale of the property but "he may have told me that the deal had gone through or stated it was the money against my property and I probably didn't hear him." She said that due to her deafness she did not always understand what was being said to her, and that Lawson could have said when he gave her the money that it was for her interest in the property.

She testified further that Lawson had made advancements to her in other instances when she did not fully understand from him the source of the money or for what purpose it was given to her. She said also that Lawson had agreed to pay a $200 dental bill for her which she could repay by her work, and she thought he had also paid some medical bills when she was in a hospital for an operation. She also could not say that she had paid in full his fee for investigative work in connection with her divorce.

She was asked whether she had ever received from Lawson an accounting for the $500 represented by the two checks and her answer was, "Well, speaking of what money he had paid me and everything now, I think it's accumulating more than that." When the question was repeated she said again, "Well, he had advanced me money periodically. When I now had time to think it over, that

has accumulated to that amount—maybe more." It may be inferred that she referred here to the fact that on November 12, 1958, she made complaint and information under oath to the Judge of the Roanoke Municipal Court that Lawson did, on or about August 21, 1958, "feloniously take and receive money in the sum of $500.00, as an agent for Rachel L. Taylor, and convert the said money to his own use."

After the Commonwealth's attorney several times had failed to get from her a statement that she had not authorized Lawson to endorse her name on the checks, he asked her whether that was her signature on the checks. She replied that she did not sign them herself. He then asked, "Did you give anyone permission to sign it for you?" She answered, "Well, Mr. Crush, I feel like he was taking care of the transaction in the house matter; he was entitled to do— to take what action was necessary—whatever action was necessary." In a further effort to get a specific answer these questions were asked and these answers made:

"Q. Now, I'm not asking that you told him to handle the transaction; I'm asking, did you ever tell him in words to the effect, 'You sign my name,' or words to that effect?

"A. I can't recall but anyway, Mr. Crush, I had written him from Maryland and it seems like I did mention something in the letter, 'Would he take care of the matter.' I don't know whether I stated to sign my name or not.

"Q. Then I'm asking you again, do you have any recollection of ever having told him to sign your name; do you recall doing it? If you don't remember, say so; if you do, say so.

"A. I don't.

"Q. Ma'am?

"A. I do not remember."

J. W. King and a Captain of detectives also testified for the Commonwealth but their evidence added nothing to the point of whether Lawson had authority to endorse the name of Mrs. Taylor on the checks. The defendant moved that the court strike the evidence of the Commonwealth, the motion was overruled and he offered no evidence in his own behalf.

The court instructed the jury that the burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant did not have authority to endorse the name of Rachel L. Taylor on the two checks in question. There was no objection to the instruction and it is not controverted here that it correctly stated

the burden of proof. See *Taylor* v. *State*, 114 Neb. 257, 207 N. W. 207; *Owen* v. *People*, 118 Colo. 415, 195 P. 2d 953; *Roberts* v. *State*, Tex. Cr. App., 53 S. W. 864.

In the last-named case Roberts was charged with forging the name of one Polly to an order for the purchase of alcohol. Polly testified he did not write the order or authorize Roberts to do so, "that he had any recollection of." The conviction of Roberts was reversed on the ground that Polly did not swear positively that he did not give Roberts authority, but that the substance of his testimony was that he did not recollect whether he did or not.

The evidence against Lawson was not sufficient to support the burden of proof resting on the Commonwealth. Admittedly Lawson signed the name of Mrs. Taylor on the checks, but without more the presumption is that he did so by the authority of Mrs. Taylor. Mrs. Taylor would not testify that he did not have such authority. The general tenor of her testimony was that he probably did have authority, or that possibly she had given him express authority, but at best she did not remember whether she had or not. At the time she swore out the warrant charging him with embezzlement she evidently believed that Lawson had received and possessed money that belonged to her, but in her testimony she indicated that she had changed her mind about that and was rather of opinion that he had a right to have it. Her evidence in this case was too indefinite and uncertain to warrant Lawson's conviction of the charges in the indictments.

The judgments appealed from are accordingly reversed and the cases are remanded for new trials if the Commonwealth be so advised.

*Reversed and remanded.*