No. 15,938.

OWEN *v*. THE PEOPLE.
(195 P. [2d] 953)

Decided June 28, 1948.

Mr. Anthony F. Zarlengo, Mr. Frederick E. Dickerson, Mr. Clement F. Crowley, for plaintiff in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Mr. James S. Henderson, Assistant, for the people.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Homer H. Owen, to whom we herein refer as defendant, was charged with the crime of forgery, to which charge a plea of not guilty was entered. Upon trial the jury returned a verdict of guilty; judgment was pronounced thereon, to reverse which this writ of error.

Defendant was the president and in charge of the Englewood Industrial Bank, at Englewood, Colorado, which had been organized in January, 1945, with all of its capital advanced by defendant and his family. C. N. Ruberson, individually or under the name of Ruberson

Motors, was a frequent borrower of the bank's funds, and, prior to the organization of the bank, had borrowed from Owen Finance, Inc. According to the bank's records, on August 5, 1946, Ruberson was indebted to it in the sum of $3,300, evidenced by a promissory note secured by chattel mortgage on certain automobiles. The forgery charge is based upon this $3,300 note, dated July 16, 1946, signed by Ruberson Motors, by C. N. Ruberson, Owner. According to Ruberson's testimony, he, on May 26, 1944, as a matter of accommodation to defendant, executed a note in the sum of $4,000, payable to Owen Finance, Inc., securing the payment thereof by chattel mortgage on second-hand automobiles delivered to him for sale by Owen Finance, Inc., the title to which remained in Owen Finance, Inc., or in Owen. Subsequently, the note and chattel mortgage, together with other securities and cash, were transferred by Owen Finance, Inc., to the Englewood Industrial Bank for the purpose of providing it with its required capital for incorporation. It appears from the record that the Ruberson $4,-000 promissory note and renewals thereof were reduced by payments thereon to the sum of $2,700 in July, 1946, when the principal amount became due. On August 3, 1946, there was found among the assets of the bank the Ruberson promissory note, which is the basis of the forgery charge here. Ruberson testified that the signature to said note and chattel mortgage was not his, and that he had not authorized defendant or anyone else to execute either the note or chattel mortgage for him or in his name. A handwriting expert testified that in his opinion the signature to said promissory note and chattel mortgage was in the handwriting of defendant, basing his opinion upon a comparison with admittedly genuine signatures of defendant. On August 3, 1946, the state bank commissioner completed an examination of the Englewood Industrial Bank and reached the conclusion that it was insolvent. Thereupon, he, through a deputy, took charge thereof. He prepared an inventory

of the bank's assets at the conclusion of business on August 3, 1946. This inventory, over the objection of defendant, was admitted in evidence, and listed among the assets of the bank were notes as follows:

*"Assets*

Loans and Discounts:

| | | |
|---|---:|---:|
| Notes Regular (Some of doubtful value) | $96,145.03 | |
| Notes (Secured by own bank stock) | 9,825.00 | |
| Notes (Forged and considered *fictitious)* | 43,921.90 | |
| Notes (Worthless) | 1,833.43 | |
| Notes (Excess over book value) | 733.74 | 152,459.10 |
| | | |
| Furniture and Fixtures (Doubtful) | 2,929.42 | |
| Less Reserve for Depreciation | 785.88 | 2,143.54 |

Due from Banks:

| | | |
|---|---:|---:|
| First Natl. Bank, Englewood, Colo. | 16,187.79 | |
| Colorado Natl. Bank, Denver, Colo. | 25,000.00 | |
| Colorado Natl. Bank, Denver, Colo. (MO a/c) | 333.08 | 41,520.87 |

Cash Items:

| | | |
|---|---:|---:|
| Good | 2,971.59 | |
| Doubtful | 5,334.31 | 8,305.90 |
| Cash on Hand | | 7,198.93 |
| Accounts Receivable (Doubtful Owen Fin. Co.) | | 7,000.00 |
| | Total Assets | $218,628.34 |

*Liabilities*

| | | |
|---|---|---|
| Capital Stock | | $ 50,000.00 |
| Surplus Account | | 10,165.60 |
| Undivided Profits | | 734.64 |
| Deposits: | | |
|   Savings | $99,647.13 | |
|   Christmas Club | 2,912.00 | |
|   Investment Certificates | 54,304.03 | 156,863.16 |
| Cash Over | | 64.50 |
| Notes Over | | 733.74 |
| Social Security-Withholding Tax | | 65.70 |
| | Total Liabilities | $218,628.34" |

(Italics Ours)

The notes classified by the state bank examiner as "forged and considered fictitious" numbered in excess of forty, many of them bearing endorsements that installments due thereon were current or practically so. These notes were examined by a handwriting expert who testified that, in his opinion, they were all signed with the name of the purported maker by defendant. The deputy placed in charge of the bank by the state bank commissioner mailed notices, identified in the record as Exhibit Q, to all of the purported makers of these promissory notes and most, if not all, were returned with notations on the outside of the envelopes assigning as reasons for their return: "For better address," "No such number," "Not in directory," "Returned for better address," "Unknown," "Not in R.F.D. 9," and "Wrong Address."

The record does not disclose who made the notations above mentioned on the envelopes and they, together with the forty odd notes which the handwriting expert had testified were in defendant's handwriting, were, over the objection of counsel for defendant, admitted in evidence for the purpose of showing a "plan, design

and intent" to commit the crime of forgery charged in the information.

Too frequently to mention, and over the objection of defendant, witnesses were permitted to characterize the forty-odd promissory notes as fictitious and as forgeries, notwithstanding the fact that in excess of $3,000 was collected thereon by the deputy who took charge of the bank. No attempt whatever was made by the deputy in charge of the bank to collect on any of the notes so classified by the state bank commissioner. The deputy realized from the assets of the bank sufficient to pay all of its depositors in full without disposing of the so-called forged notes and furniture and fixtures of the bank and had on hand after the payment of all of the depositors and liquidating charges of approximately $5,000, a sum in excess of $400.

One witness, not properly qualified as a handwriting expert, was permitted to testify, over objection of the defendant's counsel, that from an examination of the handwriting in the books and records of the bank it was his opinion that the signatures to the forty-odd notes in question were in the handwriting of defendant.

It is disclosed by the record that during his closing argument the district attorney was permitted, over the objection of counsel for defendant, to read the following from a dictionary, "Defraud: To deprive of some right of interest by deception, cheat, withhold unlawfully."

At the trial the district attorney introduced evidence to establish that the bank's capital was impaired on August 3, 1946, and defendant tendered an instruction, which the court refused to give, setting forth the duties of the state bank commissioner when he finds an impairment of the capital of a bank. In the record, attached to the supplemental motion for a new trial, is an uncontradicted affidavit of Anthony F. Zarlengo, one of defendant's attorneys, in which he states that during the argument to the jury the district attorney, over de-

fendant's objection, was permitted to read section 151, chapter 18, '35 C.S.A., as amended.

The motion for new trial sets forth fourteen, and the supplemental motion thirteen additional, grounds for new trial, and the assignments of error are twenty-five in number. We shall consider but two of these assignments: First, the introduction of Exhibit Q and related Exhibit V, and, second, the conduct of the district attorney.

■■ 1. Exhibit V is a printed notice addressed by the deputy bank commissioner to each of the bank's debtors disclosing their individual indebtedness according to the bank's records and demanding payment thereof in accordance with the terms of the note. One of these notices was enclosed in each of the forty-odd sealed envelopes which were designated as Exhibit Q and upon which unopened envelopes were the notations as hereinabove noted. It was said by the district attorney in offering Exhibits Q and V that they were offered for the sole purpose of showing an "intent, design and plan." It is a general principle of law that to establish falsity in a forgery charge it must be made to appear not only that the person whose name is signed to the instrument did not sign it, but also it must be established by competent evidence that the name was signed by defendant without authority, for if the purported maker authorized the defendant to sign the instrument in his name or if the defendant so signed the instrument in an honest belief that such authority existed, no crime is committed. The gist of the offense of forgery is the "intent to prejudice, damage or defraud," and the burden of establishing that the alleged forged instrument was signed by the defendant without authority from the purported maker thereof always rests upon the prosecution. *Cohen v. State,* 7 Colo. 274, 3 Pac. 385; *Taylor v. State,* 114 Neb. 257, 207 N. W. 207; *Brown v. State,* 115 Neb. 325, 212 N. W. 625; *State v. Dixson,* 185 N. C. 727, 117 S. E. 170; *State v. Swan,* 60 Kan. 461, 56 Pac. 750;

*People v. Lundin,* 117 Calif. 124, 48 Pac. 1024; *State v. Hardin,* 137 Ore. 250, 300 Pac. 347, 2 P. (2d) 1107; *State v. Kozukonis,* 71 R. I. 456, 46 A. (2d) 865; *People v. Maioli,* 135 Calif. App. 205, 26 P. (2d) 871; 37 C.J.S., p. 90, §80; 2 Bishop on Criminal Law (9th ed.), p. 447, §579.

■■ A properly qualified handwriting expert testified that in his opinion the signatures to the forty-odd notes in question and related to Exhibits Q and V were in the handwriting of the defendant. If the notations on Exhibit Q were for the purpose of establishing that the purported makers were fictitious persons, they were hearsay and not competent for any purpose; that their admission in evidence prejudiced the defendant by conveying to the jury a definite impression that no such persons existed seems to be a most logical conclusion. If, as a matter of fact, the names appearing on the notes were those of existing persons and the signatures referred to in Exhibit Q were signed thereto by defendant, the admission of the notes in evidence and all reference thereto was prejudicial because there was no attempt to produce competent evidence to establish that the defendant was not duly authorized to sign the notes in the names of the purported makers. In a trial on a charge of forgery it is not sufficient to prove that defendant signed the name of another to the questioned instrument and that he passed the same as genuine, for this alone does not establish the commission of the crime of forgery. In addition thereto, it must be shown that the instrument in question was a false instrument, and this is not established until it has been shown by competent evidence that the defendant, if and when he signed another's name, did so without authority to do so. Until this lack of authority is shown, the questioned instrument cannot be classified as false, and under our statute, simply writing the name thereon does not constitute the crime of forgery. It was error to admit in evidence Ex-

hibits Q and V, and that their admission was prejudicial cannot be a matter of doubt.

█ 2. It appears from the record that during the course of the trial evidence was admitted tending to show that the crime charged in the information, and various other so-called transactions, resulted in an impairment of the capital of the Englewood Industrial Bank. Defendant tendered an instruction covering the statute on impairment of capital, and this instruction was refused. During the final argument to the jury, the district attorney, over the objection of defendant's counsel, read section 151, chapter 18, '35 C.S.A., as amended, to the jury, this section being the one providing the minimum capital requirements of an industrial bank; also, according to the record, and over the objection of defendant's counsel, he read a definition of fraud from some edition of Webster's Dictionary as hereinbefore stated. It is the duty of a trial court to instruct the jury on all matters of law to be properly considered by it in the determination of the cause. No instruction on said section of the statute was requested by the district attorney, and no such instruction was given to the jury. No instruction on fraud was requested by the district attorney, and none such was given. If a district attorney reads to a jury the statutes which he considers necessary for consideration by it in its deliberations, he thereby usurps the court's proper function. It requires the citation of no authority to demonstrate beyond peradventure of a doubt that the conduct of the district attorney in this respect was wholly improper and that error was committed by the court in not admonishing the jury and properly instructing it to disregard the district attorney's attempt to bring to the jury's attention for their consideration in reaching their verdict any law other than that set forth in its instructions.

█ We are not here concerned with the guilt or innocence of the defendant; the only matter properly before us is to determine whether the trial of the defend-

ant was conducted in accordance with well-established rules of evidence and procedure.

There are many other errors assigned which we deem unnecessary to discuss, but, because we do not do so, it should not be considered as an indication that they lack merit. In event of another trial, their recurrence is unlikely.

We hold that the defendant was not given a fair and impartial trial and, accordingly, the judgment is reversed.

MR. JUSTICE LUXFORD does not participate.