No. 19,009.

PETER FALCON *v.* PEOPLE OF THE STATE OF COLORADO.

(352 P. [2d] 310)

Decided May 23, 1960.

Plaintiff in error, pro se.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

PLAINTIFF in error, hereinafter referred to as the defendant, was accused of the murder of his wife. He entered a plea of not guilty, and upon trial the jury returned a verdict of guilty of murder in the second degree. Motion for new trial was overruled and the court entered judgment on the verdict, sentencing the defendant to a term or not less than thirty nor more than forty years in the penitentiary at Canon City.

Defendant, appearing in this court pro se, seeks reversal by writ of error. His "brief" assigns error under nineteen separate captions. Matters discussed under nine of these captions were not made a part of the motion for a new trial, and although not required to do so, we have read the "arguments" in support of these "assignments" and find them to be without merit.

Six of the captions contained in the brief of defendant relate to matters occurring during trial, to which no objection was made. Such matters are not properly before us, are trivial in nature, without legal substance, and undeserving of further mention.

The evidence upon which the people relied for con-

viction was chiefly circumstantial. A summary thereof follows:

The evidence shows that early on the morning of July 2, 1952, defendant left his Denver apartment and went out in the hall to get water for coffee. While there he met and talked to a neighbor, Mr. Sabia. He then returned to his apartment, raised the window shade, and looked at his wife who was still in bed. She had blood on her chest and he got a towel to clean it off. About that time he became "really concerned" and ran to the police station a short distance away to report the matter and ask for an ambulance. He then rushed back to his apartment and found two officers already there. The officers observed a partially clothed body, later identified as Mrs. Lucille Falcon, lying on the bed with a wet towel draped across her forehead and two wounds in the upper part of her left chest. Shortly thereafter, a physician who had been summoned arrived and pronounced her dead. It was his professional opinion that she had been dead approximately two hours. An investigator from the Denver Medical Examiner's office also arrived and reached substantially the same conclusion.

Later that day, July 2, 1952, the Chief Coroner's Pathologist performed an autopsy on the body of the deceased. An examination of the two small wounds on the left side of the chest revealed them to be about two and two and one-half inches deep respectively and were caused by a sharp instrument. It was the pathologist's opinion that death was caused by a "stab wound of the chest."

Officer Bates of the Denver Police Department investigated defendant's apartment that same morning. In the course of his investigation he picked up a pair of scissors which appeared to have a small spot of blood on them, two sheets and a pillow from the bed, and the green towel which the defendant said he had used to wipe the blood from his wife's chest. Detective Ward, of the

Denver Police Department, observed blood on the sheets, and on a T-shirt which he said the defendant was wearing.

The foregoing evidence was undisputed. The disputed evidence is concerned directly with what transpired during the early morning hours prior to the victim's death, and the responsibility of the defendant therefor.

Defendant steadfastly maintained, when questioned by the police and while on the witness stand, that his wife must have committed suicide, and that he had nothing to do with her death. Several times on the day of the death, he told officers of the events which he claimed had transpired the night before and that morning. His story was that both he and his wife had been to several bars the night before; that he had gotten disgusted with her because she had "rolled a soldier" for $120.00, thrown the money to another man when the police came to investigate, and then wanted to go and try to get the money back; that he wanted nothing to do with such a matter and so went home alone and went to bed; that his wife came in shortly afterwards and got into bed with him; that this happened about 2:00 a.m., and he was conscious of nothing more until he awoke at around 5:30 the next morning and discovered his wife was dead, and this only after he'd gotten out of bed, started to make the coffee and raised the window shade. In some versions of his account, he said he woke up because of his wife's loud snoring; in others that it was simply his usual hour of awakening.

In support of his contention that his wife probably committed suicide defendant produced evidence to show that she had several times threatened or attempted suicide, and said that she could make it look as though he had killed her. He testified that the reason he did not wake up during the night in question was that he is an extremely sound sleeper; that before the trial he had never even seen the scissors introduced by the People;

and that the T-shirt which the People introduced as Exhibit H must have belonged to his stepson. He said that he never wore a T-shirt. Furthermore, another pair of scissors was found in a basket under the bed close enough to the victim that it could have been a suicide weapon.

The People produced evidence to show that defendant and the victim had had numerous quarrels in the past; that she had considered divorce and he had been officially restrained from molesting her; that in the early hours of the morning on which the victim died neighbors on the same floor had heard a woman's gurgles and screams. Defendant, it was also related, had been heard threatening to kill his wife. Two people, during the course of the trial, testified, without objection, that they did not think the death was a suicide. The chief pathologist of the city testified that because of the angle of the wounds, they were not, in his opinion, self inflicted, but admitted that suicide, though improbable, was possible. Detective Ward testified that there was no weapon found in the room near enough to the victim to have been used by her.

Defendant argues that error was committed by the trial court admitting the following items in evidence: the scissors upon which the officers said they found blood, the sheets and the pillow from the bed in which the deceased was found, the T-shirt with blood on it which the officers said defendant was wearing on the day of the death, and photographs of the body showing the stab wounds. A sewing basket and a knife were brought into the court room, and were within the sight of the jurors, but they were not offered in evidence, nor were they marked for identification.

 No error was committed by the trial court in admitting the exhibits offered by the people; all were found at the scene and were directly connected with the death. Defendant cites no authority in support of his

contention that error was committed in that connection. In *Militello v. The People,* 95 Colo. 519, 37 P. (2d) 527, this court said, inter alia:

"A case of circumstantial evidence * * * implies the weaving of a fabric of known fact, which, often infinitesimal or immaterial, or even prejudicial when considered alone, become important only as they are tied to others, and when so tied lead to the inevitable conclusions as to facts in issue."

Defendant's main argument is that the people "failed to produce sufficient evidence of any type, either direct or circumstantial, to overcome the presumption of innocence of the accused."

An experienced and capable trial judge heard the evidence and concluded that the question of homicidal death and defendant's connection therewith was for the consideration of the jury. The evidence, although circumstantial, and the inferences to be drawn therefrom, was sufficient to sustain the verdict of guilt.

In *Wolfe v. The People,* 90 Colo. 102, 6 P. (2d) 927, this court said, inter alia:

"Ordinarily it is for the jury to determine what inference shall be drawn from the facts proven and whether, as here, the defendant's guilt shall be inferred from the evidence, 4 Elliott on Evidence P. 288, Sec. 3009. If the inference of guilt fairly flows from the evidence, we can not say, as a matter of law, that the jury should not have adopted the view it did. * * *"

This language is applicable to the instant case.

The judgment is affirmed.

Mr. Justice Knauss not participating.