No. 19,795.

PAUL LEE EDWARDS *v.* THE PEOPLE OF THE STATE OF COLORADO.

(377 P. [2d] 399)

Decided December 17, 1962.    Rehearing denied January 14, 1963.

Mr. J. B. CHAMPION, JR., Mr. JAMES F. CULVER, Attorneys, Mr. JOHN H. TIPPIT, of Counsel, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

PLAINTIFF in error, to whom we will refer as defendant, was convicted of the crime of first degree murder and judgment entered imposing a sentence of life imprisonment in the state penitentiary at Canon City, Colorado.

As grounds for reversal of the judgment counsel for defendant assert that:

1. There was insufficient evidence to warrant submis-

sion of the question of defendant's guilt to the jury, and the court erred in denying defendant's motion for a directed verdict of not guilty.

2. The trial court erred in denying defendant's motion for a new trial on the ground of newly discovered evidence.

3. The trial court erred in giving an instuction on "reasonable doubt" by including therein the statement that the jury was "not to search for a doubt."

4. The court erred in refusing to grant a mistrial on the asserted ground that the district attorney was guilty of prejudicial misconduct.

5. The trial court erred in permitting officer Montoya, a witness for the people, to remain in the courtroom throughout the trial, following defendant's motion for exclusion of the witnesses.

We will treat the above assignments of error in the order in which they have been stated, and will refer to the facts pertinent to each contention as we make disposition thereof.

The first question for determination is whether the facts established upon the trial were of such quantity and quality as to legally justify the jury in determining that defendant's guilt was proven beyond a reasonable doubt. It is conceded that all of the evidence tending to establish his guilt was circumstantial in nature. A very brief summary of pertinent evidence offered by the people is in order.

In the latter part of March 1959 the defendant was in Denver without funds and hunting for a job at various service stations. On the 24th of March he made a second inquiry at one of the same stations he had visited a few days previously. During that visit, when he mentioned that he had stayed at the bus depot the night before, the service station operator gave him a dollar so he could get something to eat. On the morning of March 24th defendant went to Western Union

and sent a telegram to his father in Davis, Oklahoma, asking for money. At 2:00 P.M. he returned to the Western Union office but there was nothing there for him.

Pat's Standard Service Station on North Broadway in Denver was visited by defendant in his search for employment. He was there on the morning of the 23rd of March, and also on the 24th of March between 5:30 and 6:00 P.M. On this second visit he merely walked around the inside of the service station, used the restroom, and left. At about 6:15 the owner of the station, as was his custom, went home for the evening and left George Eaton in charge. Eaton, who was about 32 or 33 years of age, had about $50.00 to use as change in the station, and was under the usual orders to close at 9:00 P.M. He was expected to hide the $50.00, and any additional money he may have taken in during the course of the evening, some place in the service station before leaving. It was a cold, snowy night. At about 8:00 P.M. Eaton talked to his wife on the telephone for about five minutes. He told her he would be home shortly after he closed at 9:00 o'clock.

About 8:45 P.M. a school principal from Cheyenne, Wyoming, was driving through Denver on his way to a vacation in Phoenix. He drove into Pat's service station to fill up before proceeding further. At that time there were two people there, the attendant George Eaton, and defendant. During the entire time that the school principal was in and around the service station, using the restroom and getting his car gassed up, defendant said nothing, but kept an unusually happy, forced smile on his face. The customer then covered his purchase through a credit card (by which his identity and address were later easily traced by the police) and left.

About 9:15 P.M., March 24, defendant checked into the Empire Hotel in Denver and paid the clerk the $1.50 required for the room. At that time he gave his address as Kansas City, Kansas, although he had previously

stayed in that hotel a few nights before and had given his address as Route 2, Davis, Oklahoma. The desk clerk never saw defendant after he checked in at about 9:15 and had been shown to his room, but the next morning it did look as though someone had slept in the bed.

About 10:30 P.M., March 24, defendant arrived at the Continental bus terminal in Denver and bought an $8.00 ticket to Grand Junction. He was dressed in clean clothes, a coat and a tie, and as the ticket clerk collected the cash for the ticket he noticed defendant also had a suitcase with him. The same ticket clerk had seen defendant about 5:30 P.M. when he had inquired about the schedule and fare to Grand Junction, and had been told that the next bus left at midnight and that the fare was eight dollars. On that previous visit defendant apparently had been wearing the same khaki pants and light shirt that he had worn all of the times he was seen inquiring for work at the various service stations in the area. The shoeshine boy at the Continental terminal also noticed quite a difference in defendant's dress and appearance between one earlier trip to the terminal in khakis and the later trip when he was quite well dressed and paid the shoeshine boy fifty cents for a shine. When asked about the obvious change in defendant's condition as to dress and finances, defendant told the shoeshine boy that he had received a telegram. No telegram was received by him as clearly established by agents of the telegraph company.

About 11:00 P.M. that evening defendant met a newsboy in a pool parlor where the two had previously known each other and played pool. Though the newsboy knew that defendant had been completely broke earlier, and though the two of them had stayed at the same cheap hotel two nights previously when defendant appeared to have no money, no suitcase, and only the khaki clothes he was wearing, defendant at this meeting

was all dressed up and paid the newsboy $7.00 owed from losses on previous pool games. Defendant told the newsboy that his father had sent him the money and that he had gotten it from Western Union. This was a false statement. He also said that he had obtained a job as a helper at a service station and would be earning $60.00 to $70.00 a week. Defendant changed a $10.00 bill to give the newsboy the $7.00 owed him and amongst the money then in defendant's wallet the newsboy was able to see one $20.00 and one $10.00 bill. About 11:55 that night, defendant announced he had a date and left the poolhall by taxi. A cab driver picked him up and dropped him off at the Continental bus depot where he had previously purchased a ticket to Grand Junction.

When George Eaton did not arrive home as expected, from his statement to his wife in their phone conversation, she phoned the filling station several times but received no answer. She finally contacted authorities and at about 12:30 at night police officers went to the filling station and found his body on the toilet room floor. A pool of blood was found next to the grease rack and there was a trail of blood leading from that point to the place where the body was found. An "axle cleat" was lying on the floor, upon one end of which there was blood and matted hair. The cash register had been smashed on the concrete floor. It contained no currency. Some small coins were strewn about the floor. George Eaton died of brain injuries resulting from a fractured skull. Early indication was that the axle cleat was the instrument used by the killer. The pathologist examined the body at 1:30 A.M. and testified that Eaton had been dead anywhere from two to six hours.

Defendant was located in the town of Davis, Oklahoma, and within a few days following the homicide Denver detectives went to that town where he was interviewed by them. Defendant said that he was in Denver on the night of March 24, and that he left Den-

ver at 8 o'clock the next morning, March 25, for Grand Junction. He said that when he got to Grand Junction and called his grandmother her line was busy, so he decided on the spot to take a bus home to Davis, Oklahoma. He went on to say that he knew of the station at 21st and Broadway in Denver and that he had been there and that he remembered seeing the man from Wyoming purchase gas between 8:30 and 9:00 P.M. on March 24. He described the Wyoming automobile. Defendant said he didn't think anything unusual happened after that customer left the station, and that he, himself, left shortly after that. When the Denver police detective asked defendant, "Was the attendant still alive when you left there?" defendant answered, "I can't talk to you anymore." He did go on to tell the Denver officers that his khaki clothes had gotten dirty so he threw them in an ash can behind the hotel. (The area was later searched but the clothes never were found.) When asked to tell where and how he got the money which he had when he bought the ticket to Grand Junction, he said he met a former employer at a 24-hour cafe and was paid some back wages due him, but he would not answer anything about that former employer's name or address or the company for which he worked. The detective asked defendant if he killed that man and defendant's answer was, "No, but that's all I can tell you about it." The detective then asked defendant, "Why did you qualify that answer?" and defendant replied, "Well, I'd better not talk about it. I can't, — I'm not supposed to talk with you about it."

Defendant did not testify. The only evidence offered on the part of the defense was from persons who came from Oklahoma. They testified that they had observed defendant after his return to Davis, Oklahoma, and that he appeared to be calm and did not seem to be hiding from anybody. Marie Dunn, a judge of the county court in Davis, Oklahoma, testified that the questioning of

defendant was conducted by the Denver detectives in an abusive manner and that she thereupon advised him not to make any statements to them out of the presence of his attorney. The Oklahoma sheriff described the questioning of defendant by the Denver detectives as follows:

"A. Well, a very — I would say a very stiff questioning. I wouldn't want to question a prisoner of mine as heavy as they questioned him—as Montoya did. Q. Who did most of the questioning, if you know? A. This — Montoya? Q. Montoya. All right, sir. Will you tell the jury whether Sergeant Montoya's voice — Well just tell how his voice was, if you know. A. Well, he used kind of a high-toned voice in his questions. Q. Loud or soft, if you know? A. It was loud."

The witness testified that defendant told the Denver detective that, "The first that he had heard of the murder was after he had been contacted in Davis, Oklahoma, at his home." The sheriff admitted that he was not present at all times during the questioning. After knowing that defendant was wanted for murder in Colorado the sheriff permitted him to remain at home. The testimony in this connection is as follows:

"Q. * * * And he was being officially held at this time on a warrant for murder from the State of Colorado; is that correct? A. That's right. Q. But you did release him to go home and get his clothes and come back; is that right? A. I let him go home. I don't know whether you would call it released or not. I did give him permission to go home. Q. You would not have done this if he were not the son of one of the most prominent and powerful citizens in that county, would you? A. Well, it depends on the — Q. Just yes or no. A. State the question again. Q. You would not have allowed a person to leave and allowed him all this gratuity had he not been the son of a very prominent and powerful person in this county, would you? A. If

he had been — Q. Yes or no, Sheriff. (Pause.) MR. KANE: We'll withdraw the question if the witness can't make up his mind."

Sergeant Montoya denied any abusive conduct on his part and clearly indicated in his testimony that he was prevented from pursuing a legitimate investigation of the crime by the actions of the Oklahoma authorities, presumably brought about by the prominence of defendant's parents in the community. Any inferences to be drawn from the conduct of these witnesses was exclusively within the province of the jury. The jury had a right to consider all the evidence thus presented and it is presumed that it was taken into consideration in arriving at the verdict. No evidence was introduced by the defense which in any manner tended to dispute any of the conduct attributed to defendant prior to the time when he was questioned in Davis, Oklahoma.

We direct attention to the following language quoted from opinions of this court which is applicable to the facts outlined above:

In *Pena v. People,* 147 Colo. 253, 363 P. (2d) 672, we find:

"At the outset it is conceded that all of the evidence tending to tie these defendants into the burglary of the warehouse of Gower Delivery Service, Inc., is circumstantial in nature. However, circumstantial evidence is not always inferior in quality nor is it necessarily relegated to a 'second rate' status. * * * "

In *Martinez v. People,* 63 Colo. 347, 166 Pac. 241, we find:

" * * * the evidence is, as mentioned above, circumstantial only. This fact is, of course, not sufficient to justify a reversal of the judgment as circumstantial evidence may be, and frequently is, most convincing and satisfactory. * * * "

In *Ruff v. People,* 78 Colo. 474, 242 Pac. 633, we quote:
" * * * Circumstantial evidence is as competent and

potent in such a case as in any other. Material, relevant, and competent evidence, sufficient to convince the jury, is necessary to conviction, nothing more, nothing less. * * * "

In *Falcon v. People,* 143 Colo. 173, 352 P. (2d) 310:

"An experienced and capable trial judge heard the evidence and concluded that the question of homicidal death and defendant's connection therewith was for the consideration of the jury. The evidence, although circumstantial, and the inferences to be drawn therefrom, was sufficient to sustain the verdict of guilt."

In *Wolfe v. People,* 90 Colo. 102, 6 P. (2d) 927, we find the following statement concerning circumstantial evidence:

" * * * If the inference of guilt fairly flows from the evidence, we can not say, as a matter of law, that the jury should not have adopted the view it did. * * * "

The facts and circumstances shown by the evidence in the instant case were of "such quantity and quality as to legally justify a jury in determining guilt beyond a reasonable doubt." *Pena v. People,* supra.

With reference to the "newly discovered evidence" upon which it is claimed a new trial should have been granted, we hold that no error was committed by the trial court. The police officer who responded to the call to investigate the filling station at about 12:30 A.M. testified that the filling station was dark when he arrived. In support of this ground of the motion for new trial the court listened to the evidence alleged to be newly discovered. This evidence was given by persons who lived in adjoining property who testified that on the night in question they returned from a "drive-in" and noticed that the lights in the station were on. Two members of this family could not testify as to the time they returned home. Another member, the father, testified that it was 9:30 P.M. when they got home. He did not dispute an out-of-court statement made to the dis-

trict attorney by his wife to the effect that none of them knew what time they arrived home. He was unable to recall other pertinent matters which took place on the day or evening in question.

■ We have held repeatedly that motions for new trials based on the ground of newly discovered evidence are to be regarded with disfavor. The granting or refusing of such motion rests within the sound discretion of the court. *Edwards v. People,* 73 Colo. 377, 215 Pac. 855; *Eachus v. People,* 77 Colo. 445, 236 Pac. 1009; *Wiley v. People,* 71 Colo. 449, 207 Pac. 478.

■ The trial court did not err in giving the instruction on the legal meaning of the expression "reasonable doubt." The instruction has been in general use in this jurisdiction for over fifty years and when read in its entirety is a fair statement of the legal meaning of that term.

■ We have carefully examined the record in connection with the argument that the district attorney was guilty of misconduct, and we find it to be without merit. The main thrust of this argument is that the prosecutor unfairly commented on the failure of defendant to take the witness stand. The argument of the district attorney did no more than to remind the jury that it was entitled to draw any logical or reasonable inference from the circumstances shown by the evidence, since they were not disputed or explained in any manner by evidence offered on the part of defendant. Under well established rule of law no error was committed in this connection. *Davis v. People,* 137 Colo. 113, 321 P. (2d) 1103; *Lewis v. People,* 115 Colo. 434, 174 P. (2d) 736; *Allison v. People,* 109 Colo. 295, 125 P. (2d) 146.

■ The contention that the trial court erred in permitting Officer Montoya, a witness for the people, to remain in the courtroom for consultation with the district attorney after the rule excluding witnesses had been invoked, is without merit. The trial court has a

wide discretion in matters of this kind, and no abuse thereof is shown.

The judgment is affirmed.