## No. 23008.

LELAND AUGUSTINE ROMERO *v.* THE PEOPLE OF THE STATE
OF COLORADO.
(460 P.2d 784)

Decided November 3, 1969. Rehearing denied November 24, 1969.

236

238

John Ira Green, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Robert L. Hoecker, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Kelley delivered the opinion of the Court.

Leland Augustine Romero, defendant, was convicted of murder in the second degree and sentenced to a term of confinement in the Colorado Penitentiary. He is here on a writ of error.

The information charged that on November 9, 1965, in the County of Alamosa, defendant did feloniously, wilfully and of his premeditated malice aforethought, kill and murder one Patricia Romero. Patricia was the wife of the defendant.

Upon arraignment on December 2, 1965, defendant entered a plea of not guilty. Trial was begun on September 12, 1966, and was concluded on September 14, 1966, and in the evening of the same day the jury returned its verdict.

The defendant and deceased were married on June 14, 1963. Two children were born to this marriage and the deceased, at the time of her death, was six months pregnant. She was twenty-five years of age.

The domestic life of the couple was marked by frequent quarrels, mostly the result of defendant's jealous but unfounded suspicion that the deceased was seeing other men. A divorce action was pending at the time of her death and, since the latter part of July 1965, the Romeros had not been living in a common household. The deceased lived with her parents and the defendant at a nearby community. Nevertheless, during the separation the defendant and the deceased saw each other rather frequently. The defendant occasionally took Patricia out to dinner or a movie; they often spent week ends together. The defendant bought some food and clothes for his wife and their children. At times the defendant also gave Patricia money.

Shortly before midnight, November 8, 1965, the defendant drove to the home of Patricia's parents and parked in an alley behind the house. He tapped on the window of her bedroom and told her he wanted to talk to her. Patricia put on a housecoat and slippers and went outside. They stood and talked in the back yard for a moment, but because it was chilly they walked to his automobile and got into the front seat. She sat on the passenger side and Romero sat behind the steering wheel. They had a brief conversation before her death.

The defendant testified that they did not quarrel and that he did not threaten her. However, shortly after they entered the car, he removed a 22 caliber pistol from under the front seat and "was playing with it." While "playing" with it, the gun discharged. The coroner's report discloses that the "bullet entered just above the left ear penetrating the skull across to 3 inches above the right ear." At the trial the coroner testified that "there were no powder burns on the outside of the skin at all.

But there were powder burns in deep, which would indicate that the gun was held snugly to the head." Romero, at all times, maintained that he did not know the revolver was loaded; that the killing was accidental.

Immediately following the firing of the gun, the defendant heard Patricia "groan"; her head fell back. He stated (Exhibit 8):

"Well, when she was shot I couldn't believe it and I grabbed for her and the blood — I felt something warm go down my hand and I yelled and went inside and I couldn't believe it."

The defendant ran to the house, awakened his mother-in-law, Mrs. Suazo, and said, "I shot Patsy." The police were called and the police and an ambulance responded. The defendant was arrested, taken to the chambers of the trial judge, advised by the trial judge of his constitutional rights and, at his request, an attorney of his choice was summoned. Romero and his attorney conferred in private for forty-five minutes after which counsel, because of defendant's insistence that his act was purely accidental, stated, "Why don't you go ahead and cooperate with the police." This attorney did not represent Romero at the trial nor here.

In the presence of the attorney the defendant was interrogated by the police during the early morning hours of November 9, 1965. A court reporter was also present and the session was recorded. A complete transcript of the proceedings became the questioned Exhibit 8.

The defendant alleges eleven separate assignments of error which, because of the affirmance, will be separately stated and discussed.

I.

■ *Assignment (a)*. The Corpus Delicti For Second Degree Murder Was Not Proven.

In support of this contention, the defendant relies upon *Cobianchi v. People*, 111 Colo. 298, 141 P.2d 688,

and *Stull v. People,* 140 Colo. 278, 344 P.2d 455. *Cobianchi* holds that

"* * * The corpus delicti in a murder case requires two elements, each of which must be proved: (1) Death as the result of an act performed, or a wound inflicted; (2) that such act was unlawfully performed, or such wound was unlawfully inflicted by another. * * * "

Romero admits (1), but relies on his assertion that the gun was fired accidentally to negate (2). In response, the people urge that the element of *malice* essential to second degree murder may be implied from the circumstances; that the evidence of marital discord and prior acts and threats of violence were sufficient to justify the trial court's submission of the issue to the jury. Such issue was clearly drawn and the jury resolved it adversely to the defendant.

The circumstances which support the jury's verdict, in addition to those already mentioned, will be apparent from evidentiary excerpts set forth in Assignment of Error II, which follows.

██ *Assignment (b).* The Court Erred in Admitting People's Exhibit 8 Into Evidence.

The defendant, in his brief, contends:

"* * * Exhibit 8 shows on its face the type of Police questions asked, many of them by unsubstantiated accusations and without place nor time involving arrests and conviction of the defendant in the Municipal Court of Alamosa * * *; that Attorney Henry Blickhahn while present at this Police Interrogation did not participate by asking any questions or making any objections although the questions that the Police Officers were asking are more prejudicial than the answers given by the defendant, Leland Romero; that said Exhibit 8 in its entirety was substantially prejudicial to the defendant and did nothing more than to inflame the minds of the Jury to such an extent that the defendant * * * did not and could not receive a fair and impartial trial at the hands of the Jury and the Jury acted on evidence con-

tained in * * * Exhibit 8 that was incompetent, irrelevant, immaterial, inadmissible and unsupported."

The defendant relies upon the following rule from *Hawkins v. People*, 161 Colo. 556, 423 P.2d 581, to sustain his position:

"The universal and well-understood rule is that evidence of general depravity is not admissible to prove the guilt of one charged with a crime. While a defendant who takes the stand may be impeached in this state by showing former convictions of a felony, the rule does not extend to admission of acts or occurrences which show bad character on the part of the defendant. * * * "

From an examination of Exhibit 8, it appears that neither the questions asked nor the answers given tended to show "general depravity." The challenged interrogation, as we view it, was designed to show defendant's *motive* and *malice*. In marital homicide cases any fact or circumstance relating to ill-feeling; ill-treatment; jealousy; prior assaults; personal violence; threats; or any similar conduct of attitude by the husband toward the wife are relevant to show *motive* and *malice* in such crimes. *Berger v. People,* 122 Colo. 367, 224 P.2d 228; 1 *Wharton's Criminal Evidence* § 175.

A summary of the interrogation indicates the relevance of the defendant's testimony when tested by *Berger*. The defendant and Patsy had been married approximately three years, during which period they had marital troubles of great intensity.

Early in the interrogation, in order to attempt to justify the cause of his jealousy which was responsible for admitted threats and beatings of his wife, the defendant explained:

"A. Let me go back. It was when I was engaged to her right before I got married to her. This fellow came back from California and we was about to get married and he came back and interfered and I told her I didn't want him to see her since she was engaged. Anyway, she did. Therefore, I took it she was maybe untrue and then we

got married and I thought maybe she was still untrue because I didn't feel she loved me the way I loved her. "Q. Then accusing her of stepping out on you was in your own mind? You have no solid proof that she did or have any reason to believe other than what was in your own mind?
"A. Yes."

At another point, the defendant admitted that he had threatened, if he "ever found her with another man," he would shoot her. On only one occasion did Romero claim that anyone had told him that Patsy "was stepping out." A man from Pueblo, working on a project in Alamosa, told Romero that he "should watch out that he had seen [his] wife with somebody at another restaurant."

Romero also claimed some of the manifestations of jealousy were provoked by rumors of certain nocturnal activities of another Patsy Suazo (his wife's maiden name). This provocation ended, however, from two to six weeks prior to the fateful event when, he asserts, he learned the true identity of the woman involved in the rumors. From that time forward "things started going real smooth," according to the defendant.

Romero's admissions in Exhibit 8 also *explained* the threats and the beatings which he administered to his wife in this manner. He would accuse her of infidelity and threaten to kill her in order to induce her to admit the marital infractions; then he would "beat her up," but not really intending to kill her; and at all times he could "control" himself, that is, he

"* * * could go so far until she either finally gave up and would tell me that it was her that was doing these things. I could never, never — I couldn't see how she could take that and yet not tell me it was her."

The interrogation continued with these questions and answers:

"Q. I know of a couple of times you worked her over; that you beat her up.

"A. Yes, I did beat her up but it seemed like — see when

I wanted her back when I used to tell her, 'Patsy, when I do a thing like that and I really want you,' I said, 'come home at the right time not at the wrong time.' Because she used to take so long and I used to start thinking how come she didn't come home.

"Q. From where?

"A. From her folks.

"Q. Isn't this a natural thing to do?

"A. No. She used to leave because she was afraid of me or thinking that I was going to beat her up.

"Q. Leland, you carried a pretty good reputation of this, isn't this true?

"A. Yes, I did."

In addition to the admissions from which the jury could infer *malice,* the exhibit contained many exculpatory statements in support of the defendant's claim that the killing was accidental. Statements of this nature were to the effect that he "didn't kill her, because I didn't have no intentions of it"; that he did not go to Patsy's parent's home, where she was living, to threaten her; that immediately following the fatal incident he told Mrs. Suazo,

"Mom, I shot Patsy accidentally! The devil got into the gun! I know it was the devil! It had to be the devil because there wasn't a bullet in there."

The exhibit is replete with statements supporting his "theory" of accident and of conduct, relationships and attitudes which, if believed by the jury, were sufficient to have negated *malice.*

■ The admissibility of Exhibit 8 was also challenged by the defendant on the ground that it violated the defendant's constitutional right against self-incrimination; that, because of the circumstances, it was coerced and involuntary.

Romero concedes that prior to the interrogation he was advised of his right to remain silent; that anything he said could be used against him at a trial on any charge arising out of the death of his wife; that counsel of his

choice was appointed; that he conferred with counsel, after which he voluntarily submitted to questioning.

The circumstances upon which the defendant relies to support his contention that the statement was involuntary may be summarized as follows:

That while Romero had experienced counsel present during the interrogation "he permitted the same to be carried on in a threatening, unorderly manner; allowed questions to be asked that were wholly irrelevant to this case under an atmosphere of intimidation"; that counsel "did not make one single objection during the entire interrogation"; "That the questions asked were argumentative statements of fact, accusations without foundation, without place or suggestion of time."

An examination of the record leads us to conclude that there is no merit to the defendant's argument. It appears that the death of Patsy Romero occurred about midnight; that the defendant was advised of his constitutional rights at 1:30 A.M. by the same judge who tried the case; that Romero and his counsel conferred for forty-five minutes before the interrogation began at 3:15 A.M.; and that the interrogation was concluded at approximately 4:15 A.M.

The exhibit fails to disclose any threats against the defendant by any of the officers conducting the questioning. There is no indication that Romero was questioned by more than one officer at a time. On the contrary, considering the fact that there were present five police officers and a deputy district attorney, the examination appears to have been conducted in an orderly fashion.

In his objection to the admission of the exhibit, in the motion for new trial and his brief, the defendant alludes to the fact that counsel failed to object to a single question. This, according to the defendant, constituted ineffectual representation and effectively deprived the defendant of his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States.

The fact that experienced counsel was present during the interrogation and did not interpose any objections is some indication that the manner in which the examination was conducted was not disorderly nor coercive. Also, as indicated, defendant and his counsel had conferred for forty-five minutes prior to the questioning, which suggests that neither counsel nor the defendant objected because they were not surprised by the nature of the questions, but had in fact anticipated them. A brief reference to the exhibit is a rebuttal to the proposition that the questions were coercive and that counsel was ineffective. Shortly after the start of the examination the following occurred:

"Q. Leland, at this time we want you to tell us exactly what your thoughts were — what your intentions were — and everything that happened tonight. We know that you have had trouble with your wife in the past, is that correct?

"A. Yes, that's true.

"Q. Isn't it true that you have attempted to take your wife's life in the past?

"A. Shall I answer that? (Directed to Mr. Blickhahn.) Well, I don't have nothing to hide. It's true.

"Q. We want the truth. We are not here to crucify you in any way. All we want is exactly what happened tonight; the truth. If it's the truth, let us know.

"A. Yes, you said if I had threatened to take my wife's life, yes. But, also, in a way I told her that if I ever found her with another man I would shoot her and also she said she would do the same thing to me. The reason there was is there was another girl by the name of Patsy Suazo in town and therefore I was confused until they told me there was such a girl and after I found out there was from there on things started going real smooth."

██ It seems apparent that the defendant, with the blessing of his counsel, had determined to his own satisfaction that the killing of his wife was *accidental*, and that if he submitted to the questions of the police officers

his answers might convince the officers of this fact. The fact that the strategy which defendant and his counsel adopted did not produce the result which they had hoped for is not necessarily indicative of ineffective representation of counsel. *Torres v. People*, 159 Colo. 254, 411 P.2d 10.

■ It is true that virtually all of the questions asked by the police officers were "leading" and would not be permissible on direct examination in a court of law. Police officers are not trained lawyers and it is not expected that the interrogation of suspected felons will be conducted with the same formality and decorum that obtains at a trial. It is only natural that questions propounded by police officers in an interrogation of a suspected felon would take the form of leading questions, as upon cross-examination in a trial.

This court has previously considered the question raised by the defendant. In *Downey v. People*, 121 Colo. 307, 215 P.2d 892, we find this statement:

"We are not aware of any case in which this court has held an alleged confession to be inadmissible solely upon the ground that it was obtained by interrogation of the accused following his arrest. * * * We hold that the law enforcement officers of the state in their effort to solve a murder case, in the interest of justice, must have a reasonable latitude in arresting and questioning one justifiably suspected of being the murderer, and if in so doing the investigating authorities give proper consideration to the comfort and well-being of the suspected person, and conduct themselves in a manner free from threats, promises, or mistreatment of the suspect, a confession thus secured may be received in evidence, even though it was the result of several extended periods of interrogation of the accused."

Here, there was but one period of questioning which lasted for about one hour. There is not the slightest suggestion in the record that the manner in which the in-

terrogation was conducted approached third degree methods, which, of course, cannot be tolerated.

Also, because of the seriousness of the offense and the fact that the statement contained a substantial part of the evidence on *malice,* the record must be examined further to determine whether proper procedural steps were employed by the court in reaching its determination that the exhibit was admissible under the doctrine of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed2d 908, and *Compton v. People,* 166 Colo. 419, 444 P.2d 263. See, also, *Read v. People,* 122 Colo. 308, 221 P.2d 1070; *Downey v. People,* 121 Colo. 307, 215 P.2d 892, and *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593. In brief, this requires the trial judge to make a fair and reliable determination that the extrajudicial statements were voluntarily made. It is contemplated by the rule that the court conduct a hearing out of the presence of the jury and that the determination be manifested by a specific finding that the statements were voluntarily made.

We hold that the following excerpt from the record demonstrates with unmistakable clarity that the trial judge found the extrajudicial statements to have been voluntarily made:

"BY THE COURT: During the lunch recess the Court has read Exhibit 8, again, to refresh its memory as to the contents thereof. Where the question comes now that the accused is brought by law enforcement from the scene of the alleged crime directly to the County Courthouse and there the accused is forthwith advised of his constitutional rights; and where the accused requests immediate representation by an attorney of his choice and the attorney of his choice is immediately summoned and does appear and confers for a period of time with the defendant in private and after the conference the accused and his attorney, together, consent to the interrogation by law enforcement officers and he is taken into interrogation before a Court Reporter and is there

so interrogated as to the facts and circumstances surrounding the alleged crime. And even though the interrogation is so conducted that it leaves some things to be desired, still at any time the defendant and or his counsel, either one or both, could object to the interrogation and stop it at any point. But the defendant had been so advised immediately before the interrogation by the Court that any statements against his interests might be used or held against him at the time of trial and that he, nonetheless, voluntarily subjects himself to this interrogation and his counsel does not object."

Following this ruling the defendant moved to excise portions of the exhibit. The court granted part and denied part of the motion. The excised statements are not part of the record before this court.

We find that the exhibit was voluntarily made and, from an examination of the non-excised portion of the exhibit, it appears that, contrary to the defendant's contentions, the statements are either relevant and material to the issues and properly admissible or they are of such a character that even though irrelevant they are not prejudicial to the defendant.

### III.

*Assignment (c)*. The Court Erred In Permitting The District Attorney To Make An Issue Of Defendant's Financial Condition.

An essential element of defendant's case and one by which he sought to refute the implication of malice was his assertion that he and his wife had reconciled their marital differences prior to the fatal evening. As evidence of the reconciliation he sought to prove that he and his wife had been planning to purchase a mobile home so that they could resume their lives together. Out of this testimony developed an issue as to defendant's financial ability to finance the purchase of such an item. The district attorney cross-examined the proprietor of the mobile home agency, as well as the defendant, in reference to judgments, bad debts and related matters

250

as to the defendant's ability to obtain financing for such a purchase. Undoubtedly, this cross-examination was intended to raise doubts in the minds of the jurors.

The attorney general argues that the cross-examination was proper for impeachment purposes, particularly in view of the fact that the defendant had interjected the issue into the proceedings. We agree. Under the circumstances of this case the cross-examination of the defendant's witnesses as to Romero's credit rating was proper for impeachment purposes.

## IV.

■■■ *Assignment (d).* The Court Erred In Admitting Evidence of Defendant's Prior Conviction Of City Ordinance.

The reference to a conviction for a violation of a city ordinance relates to certain dialogue between the defendant and a police officer during the interrogation recorded in Exhibit 8. The subject matter was actually introduced by the defendant in answer to a question on another subject. It is unclear as to the type of offense involved in the discussion, but it seems clear that it had no particular relevancy to the issue of *malice.* However, it does appear to have a somewhat remote bearing on an apparent effort by the defendant to mend the strained relationship which existed between the defendant and Patsy's mother and father. We note that there was no objection to the questions in reference to the ordinance violation during the interrogation, nor was there a motion to excise the questions and answers at the time Exhibit 8 was offered in evidence. In view of this state of the record the defendant's assignment of error is without merit.

## V.

■■■ *Assignment (e).* The Court Erred In Allowing The Sheriff To Sit At The District Attorney's Table Throughout The Trial And In The Presence Of The Jury.

On the motion of the defendant, the court ordered that all witnesses be excluded from the courtroom. The

district attorney requested and the court granted permission for the sheriff to sit at the counsel table with the district attorney. The defendant objected to excepting the sheriff from the order, especially in view of the fact that the sheriff had signed the information.

The defendant's contention is without merit. The matter complained of was within the discretion of the trial court. No demonstrated prejudice to the defendant appears from the record; consequently, there was no abuse of discretion. *Edwards v. People,* 151 Colo. 262, 377 P.2d 399.

## VI.

 *Assignment (f).* The Court Erred In Allowing Sheriff Ben Phillips To Testify To New Matters On Rebuttal.

Defendant's complaint is that the sheriff failed to mention the blood stains on the right front door panel and the edge of the seat on the right side until he was called on rebuttal. His claim of prejudice is, "that said testimony was brought out before the defendant could know or anticipate the evidence to be developed for the sole purpose of a climatical prejudice to the defendant upon the closing of all testimony and evidence in the case * * *."

The defendant did not object to the testimony at the time of its presentation, but after he testified on surrebuttal that the body of his wife had not been moved following "the accident," he moved for a mistrial.

There appears to have been no prejudice to the defendant in denying the motion. He testified initially that he had not moved the body. In view of the position of the body and the location of the fatal wound, the presence of blood on the right door panel, if true, tends to question the truth of that testimony. The testimony was, therefore, properly rebuttal in nature.

Regardless of the categorization of the testimony, this falls within the broad range of matters which lie within the discretion of the trial court and, there being no

showing of prejudice to the defendant, we cannot disturb the trial court's ruling. *Martinez v. People,* 129 Colo. 94, 267 P.2d 654; *Porter v. People,* 31 Colo. 508, 74 P. 879; *Imperial Meat Co. v. United States,* 316 F.2d 435, *cert. denied* 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54.

## VII.

 *Assignment (g).* The Court Erred In Refusing To Remove Second Degree Murder From The Consideration Of The Jury.

The defendant's argument on this point is limited to this reason:

"* * * because the evidence as a whole was insufficient for the Jury to consider first and and second degree murder and to render its verdict of guilty as to second degree murder."

Our discourse under heading I substantially disposes of this assignment of error. We hasten to add, however, that the elements of second degree murder are the unlawful killing of another without deliberation or premeditation, but with *malice. Malice* does not have to be expressed, but may be implied. There was sufficient evidence to warrant submitting that issue to the jury. *Berger v. People, supra; Lutz v. People,* 133 Colo. 229, 293 P.2d 646; *Tate v. People,* 125 Colo. 527, 247 P.2d 665; *Kent v. People,* 8 Colo. 563, 9 P. 852.

## VIII.

 *Assignment (h).* The Court Erred In Giving Instruction 14 Over Defendant's Objection And In Refusing To Give Defendant's Tendered Instruction No. 2.

Instruction No. 14, to which defendant objects, reads: "The court instructs the jury that the statutes of this state define excusable homicide by misadventure as follows:

'Excusable homicide by misadventure is when a person is doing a lawful act without any intention of killing, yet unfortunately kills another.'

"The court further instructs the jury that one of the

defenses interposed by the defendant is that the killing was excusable, — that is, that it was by accident or misadventure. The court instructs you that three elements enter into this defense:

"1st. It must appear that LELAND AUGUSTINE ROMERO was engaged in a lawful act.

"2nd. That he was free from carelessness; and

"3rd. That he did not intend to but accidentally killed the deceased."

The material portion of Instruction No. 2, tendered by the defendant, is:

"If the shot which caused the death of Patricia (Patsy) V. Suazo Romero was wholly accidental so far as the defendant was concerned, and without intention on his part to kill any person, and not while the defendant was in the commission of an unlawful act, then your verdict should be 'Not Guilty.' "

The defendant contends that by refusing his tendered instruction the court denied him an instruction on his theory of the case. It appears that the defendant espouses the view that the criteria to be used in determining whether a killing was accidental or not is purely subjective. In his tendered instruction the fact that he may not have been free from carelessness is of no consequence as long as the act was accidental "as far as the defendant was concerned." There is no merit to this assignment of error.

In *Lutz v. People*, 133 Colo. 229, 293 P.2d 646, this court sustained the trial court's refusal of the defendant's tendered instruction because,

"* * * The tendered instruction merely stated a 'contention' without stating what constitutes excusable homicide by accident or misadventure. * * * "

Although a defendant is entitled to an instruction on his theory of the case, such instruction cannot omit the necessary legal elements of his defense. The trial court properly refused the defendant's tendered Instruction No. 2. Instruction No. 14 corrctly stated the law of this

state on accidental killing. *Lutz v. People, supra; Jabich v. People,* 58 Colo. 175, 143 P. 1092.

## IX.

■ *Assignment (i).* The Court Erred In Refusing To Instruct The Jury On Corpus Delicti As Defined In Defendant's Tendered Instruction No. 1.

Since, as pointed out above, the court correctly instructed the jury on *corpus delicti,* it was not error to refuse to give an instruction on the same proposition tendered by the defendant.

## X.

■ *Assignment (j).* The Court Erred In Removing Voluntary Manslaughter From The Jury's Consideration As A Matter Of Law And Fact, Notwithstanding Consent Of Counsel For Defendant.

It appears from the brief of the defendant that,
"* * * District Attorney suggested that voluntary manslaughter be not submitted and unwisely and injudiciously, this Counsel for the defendant assented to the removal of voluntary manslaughter and the Court thereupon eliminated voluntary manslaughter but at the same time left in the case for consideration by the Jury first degree murder, second degree murder and involuntary manslaughter which we believe was error * * * insofar as the defendant had contended from the beginning in all preliminary interrogations and had as his theory of the case that the shooting was an accident, * * *."

It is hornbook law that a trial court should only instruct the jury upon those lesser included offenses upon which there is competent evidence to base a conviction.

An examination of the record discloses that there was no evidence from which the jury could have found provocation or any attempt by the victim to injure the defendant. This is required under C.R.S. 1963, 40-2-5. It provides:
"In cases of voluntary manslaughter there must be a

serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing."

It should be pointed out that the court did give an instruction and submit a verdict to the jury on involuntary manslaughter.

## XI.

*Assignment (k).* The Court Erred In Failing To Instruct The Jury That The Defendant Had Created An Issue By His Plea Of "Not Guilty" And That Issue Was For The Jury To Decide.

Defendant, in this assignment, contends that the court's instructions to the jury contained a statement as to the crime with which the defendant was charged, but that it failed to advise the jury that the defendant had entered a plea of not guilty, thereby joining the issue. Defendant argues that without a plea of "not guilty," there was no issue for the jury to resolve and, therefore, the trial was a nullity.

The defendant recognizes *Landford v. People,* 148 Colo. 300, 365 P.2d 893, as the law of this state, but claims that it is not applicable. In *Landford,* the defendant had entered a plea of "not guilty by reason of insanity." The record showed no disposition of any issue raised by that plea. Then, according to the opinion,

"* * * Defendant proceeded to trial without objection and in all respects contested the case as though the 'not guilty' plea had been entered. No mention was made of the point in the motion for a new trial, and the matter has not been called to the attention of the trial court in any way. * * *"

The record here indicates that at the time the defendant initially appeared for arraignment he was without counsel. The defendant requested the appointment of counsel. After a hearing as to his indigency the court appointed his present counsel to represent him. His subsequent pre-trial appearances in court were at hearings

on his "motion for bail" and "motion for discovery." So far as the record discloses, the defendant was not arraigned and did not enter a plea of not guilty.

The transcript of the trial, the instructions "given" and the briefs of the defendant and the People demonstrate that the defendant, as in *Landford,* proceeded to trial without objection and in all respects contested the case as though the "not guilty" plea had been entered.

The defendant was not prejudiced by this procedural omission. This appears to be the exact case which C.R.S. 1963, 39-7-9(2) was designed to meet.

This statute reads:

"And in case the party indicted or informed against, shall not, for any reason, be arraigned as provided by law, and shall thereafter enter upon the trial upon the charge contained in said indictment or information, without objection, because of not having been so arraigned as provided by law, then and in that event, such error or omission being called to the attention of the trial court or judge, at any time during the progress of said trial, or at any time thereafter, in case of conviction, said court or judge shall cause an order to be entered, of a plea of not guilty, said order to take effect nunc pro tunc as of the day of and immediately before the beginning of said trial, and upon the entry of said order, an issue upon the charge contained in said indictment or information shall be deemed to have been raised between the people and the defendant in such case as of the date of the beginning of said trial, and no motion in arrest of judgment or otherwise shall be sustained by the court or judge because of the omission of a plea in behalf of defendant at or before the beginning of such trial."

In compliance with the edict of the statute, we hereby call to the attention of the trial court the "error or omission" and direct that a nunc pro tunc order of a plea of not guilty enter pursuant to the statute.

A review of the entire record, the assignments of

error, and the defendant's arguments in support thereof fail to disclose any error which deprived him of a fair trial.

The judgment is affirmed.

MR. JUSTICE DAY, MR. JUSTICE GROVES and MR. JUSTICE LEE dissent.

MR. JUSTICE GROVES dissenting.

I respectfully dissent. My disagreement with the majority opinion concerns the application of the statement therein that the portions of Exhibit 8 admitted in evidence "are either relevant and material to the issues and properly admissible or they are of such a character that even though irrelevant they are not prejudicial to the defendant." A portion of the exhibit admitted in evidence contained the following statement by one of the interrogating police officers:

"Just a minute! That all came up with that foul up down there on the city job and the City Manager and Delbert Romero when that trouble all came up with the city over the cement and stuff and you went into court and the judge hit you with an eighty dollar fine, didn't it? And the judge told you he would suspend the fine if you would go to the State Hospital."

Obviously this statement was not relevant and material and under the majority opinion it is held to be not prejudicial. To me the mention of commission of some crime unrelated to that charged would tend to color the jury's attitude against the defendant. The suggestion of his admission to the State Hospital (well known to be the hospital for insane and other mental defectives) removes any doubt concerning the prejudicial nature of the evidence. Few rules of law are more firmly established in this state than the one that evidence is not admissible which shows or tends to show that the accused has committed a crime wholly independent of the offense

of which he is on trial. See *Ruark v. People*, 158 Colo. 287, 406 P.2d 91 and cases cited therein.

"Ordinarily, in a prosecution for a particular crime, evidence which tends to show that the accused has committed other crimes unrelated to the crime charged is irrelevant and inadmissible. *Kostal v. People*, 144 Colo. 505, 357 P.2d 70, *Cert. denied*, 365 U.S. 804, 81 S.Ct. 471, 5 L.Ed.2d 462. The judicial philosophy underlying the exclusion of such evidence is that its tendency to inflame and prejudice the jury outweighs its evidentiary value and that an accused is entitled to be tried on the crime charged and not for being a criminal generally." *Naranjo v. People*, 161 Colo. 76, 419 P.2d 953.

The defendant's vigorous objections were amply sufficient to preserve the error of the admission of this evidence and, after the court had overruled these objections, they were not waived by the defendant's subsequent effort to have portions of the exhibit excised.

The majority opinion states that this evidence appears "to have a somewhat remote bearing on an apparent effort by the defendant to mend the strained relationship which existed between the defendant and Patsy's mother and father." There is a certain inexplicability in the majorities' statement; but beyond that, even if there was such an apparent effort of the defendant, this does not justify the error committed. The majority would justify the admission of this evidence by the fact that the attorney present during the interrogation did not object at *that time*. We are not here concerned with his objections or lack of them at the time of the interrogation, but rather with the admission of evidence at the time of trial.

I am authorized to say that MR. JUSTICE DAY joins in this dissent.

MR. JUSTICE LEE dissenting.

I concur in the dissenting opinion of MR. JUSTICE GROVES. I dissent for the further and additional reason that it is my belief that the court did not sufficiently

instruct the jury on the laws of excusable homicide. Instruction No. 14 concerning this defense omits substantial portions of the statute (C.R.S. 1963, 40-2-18[1] and [2]); fails to advise the jury relative to the burden of proving circumstances excusing the homicide (C.R.S. 1963, 40-2-20); and fails to instruct the jury to acquit the accused if it find excusable homicide (C.R.S. 1963, 40-2-19). The ultimate responsibility is the court's to fully and completely instruct the jury on the law of the case, both as it pertains to the legal defenses asserted, as well as to the crimes alleged to have been committed. *Owen v. People*, 118 Colo. 415, 195 P.2d 953; *Kolkman v. People*, 89 Colo. 8,300 P. 575; *Stoltz v. People*, 59 Colo. 342, 148 P. 865. For this additional reason, I believe the judgment of conviction should be reversed and the cause remanded for a new trial.