No. 20,057.

JOSEPH CORBETT, JR., ALIAS WALTER OSBORNE, *v.*
THE PEOPLE OF THE STATE OF COLORADO.
(387 P. [2d] 409)

Decided November 18, 1963. Rehearing denied December 30, 1963.

Mr. WILLIAM H. ERICKSON, Mr. H. MALCOLM MACKAY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN E. BUSH, Assistant, Mr. RICHARD L. EASON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE McWILLIAMS delivered the opinion of the Court.

BY direct information Joseph Corbett, Jr., alias Walter Osborne, was charged with the murder of Adolph Coors III on February 9, 1960, to which charge Corbett pled not guilty. Upon trial a jury of his peers adjudged him to be guilty of murder in the first degree, fixing his

punishment at life imprisonment in the State Penitentiary. By the present writ of error Corbett seeks reversal of the judgment and sentence entered thereon.

Although it is contended that the trial court committed error in some 103 particulars, in our view the dominant issue posed by this writ of error pertains to the alleged insufficiency of the evidence. At the close of the People's case, Corbett moved for a directed verdict of not guilty for the announced reason that "the evidence . . . is insufficient as a matter of law to justify the submission of the case to the jury." This motion was denied, whereupon Corbett elected not to call witnesses in his own behalf, counsel declaring that "the defendant stands on his motion and rests."

Corbett contends that the trial court erred in denying his motion for a directed verdict of "not guilty" and *a fortiori* that the judgment entered on the jury's determination that he was guilty of first degree murder cannot be permitted to stand and must therefore be set aside. ·

There is no serious contention that the People failed to establish the *corpus delicti*. Without recounting the grisly evidence in this regard at this point, we conclude that by evidence which was both direct and circumstantial in nature, the People proved, *prima facie,* that Coors died as the result of a criminal act.

The more precise issue is whether the People established, *prima facie,* that it was Corbett who committed the homicide. The evidence in this regard was virtually all circumstantial, there being no eyewitnesses to the homicidal act and the accused never having confessed thereto — a situation which frequently prevails in a criminal proceeding.

A thoughtful review of the record convinces us that there is ample evidence to support the verdict of the jury and the judgment entered thereon, and this even though the evidence in the main is circumstantial in nature. To give meaning to this conclusion and to demonstrate its application to the situation before us,

460

the evidence adduced upon trial must be summarized in some detail. Before doing so, however, it is deemed profitable to make some brief comment at the very outset as to the inherent nature of circumstantial evidence, and its standing in a criminal proceeding.

 20 Am. Jur. Evidence, sec. 273, at p. 261, sets forth the general rule that "whatever may be established by direct evidence in a criminal case may also be established by circumstantial evidence," noting that "the rule is one of necessity . . . [as] . . . only few convictions could be had if direct testimony of eyewitnesses were required." This is a common sense rule necessitated by the obvious, i.e., crimes are frequently committed at a time and place where no observers are present and though some accused of a crime do "confess," many others do not. This same authority then flatly declares that "circumstantial evidence in criminal cases may be fully as satisfactory as positive testimony and will sometimes even outweigh it."

As proof of the fact that the foregoing general rule is not of recent origin, but one of long standing, we quote with approval the remarks of Justice Park in his charge to the jury in the case of *King v. John Thurtell* (Jan. 1824), as such is set forth in a footnote in 2 Wheeler's Criminal Cases, page 462:

"The eye of Omniscience can alone see the truth in all cases; circumstantial evidence is there out of the question, but clothed as we are with the infirmities of human nature, how are we to get at the truth without a concatenation of circumstances? Though in human judicature, imperfect as it must necessarily be, it sometimes happens, perhaps in the course of one hundred years, that in a few solitary instances, owing to the minute and curious circumstances which sometimes envelope human transactions, error has been committed from a reliance on circumstantial evidence; yet this species of evidence, in the opinion of all those who are most conversant with the administration of justice, and most

skilled in judicial proceedings, is much more satisfactory than the testimony of a single individual, who swears he has seen a fact committed."

Colorado has recognized that circumstantial evidence "is not always inferior in quality [to direct evidence] nor is it necessarily relegated to a 'second rate' status," and further that "circumstantial evidence may be, and frequently is, most convincing and satisfactory." *Pena v. People*, 147 Colo. 253, 363 P. (2d) 672, and *Martinez v. People*, 63 Colo. 347, 166 P. 241.

In *Militello v. People*, 95 Colo. 519, 37 P. (2d) 527, it was said, "The attacks upon much of this evidence, including the contention that it should have been stricken on defendant's motion are based upon the theory that isolated statements do not prove definite facts. This is seldom possible and never essential. A case of circumstantial evidence can rarely be so constructed. Its very nature implies the weaving of a fabric of known facts, which, often, infinitesimal or immaterial, or even prejudicial when considered alone, become important only as they are tied to others, and when so tied lead to inevitable conclusions as to facts in issue . . . "

■ Having thus demonstrated that circumstantial evidence is no stranger in a court of law and that on the contrary it has both standing and stature, the next question posed is "how much" circumstantial evidence is required to sustain a conviction in a criminal proceeding, be it for a homicide or otherwise. The answer thereto is the same *quantum* as in a criminal proceeding based on direct as opposed to circumstantial evidence, i.e., sufficient evidence to establish guilt beyond a reasonable doubt, no more, no less.

In *Conferti v. People*, 79 Colo. 666, 247 Pac. 1065, it was stated that to sustain a conviction on circumstantial evidence: " . . . it is not true that the circumstantial evidence must be such that no possible theory other than guilt can stand, but that the theory of guilt must be beyond a reasonable doubt, i.e. the circumstances

must not be consistent with innocence within a reasonable doubt, and that the jury must decide . . . It cannot be possible that circumstantial evidence must amount to a mathematical demonstration while ·direct evidence need only go beyond a reasonable doubt . . . The evidence is conflicting and the jury has decided."

In like vein, it was stated in *Militello v. People,* supra, a criminal prosecution for arson based on circumstantial evidence, that: "In prosecutions for arson the rule as to the proof of corpus delicti and intent is the same as in other prosecutions for other crimes where direct evidence is relied on . . . Exclusion of every 'possible theory other than guilt' is not required . . . Exclusion of 'every other *rational* hypothesis,' which means *reasonable* hypothesis, is the test . . ."

See, also, *Gonzales v. People,* 128 Colo. 522, 264 P. (2d) 508, and *Davis v. People,* 137 Colo. 113, 321 P. (2d) 1103.

In the light of these well-settled principles, what are the "known facts" in the instant case which when "tied" together led the jury to the conclusion that Corbett murdered Coors and because of their incriminating nature "exclude every rational [i.e., reasonable] hypothesis other than [that] of guilt"? Let us examine the record.

Corbett, using the name of Walter Osborne, was employed by a Denver paint company from March 19, 1956, to October 2, 1959, voluntarily terminating his employment on this latter date for the announced reason that "he was going back to school." A fellow employee testified that he and Corbett, known to him as Osborne, had several conversations wherein "guns" and "money" were the topic of their discussion. On one such occasion Corbett showed this witness a nine millimeter Llama automatic. Concerning "money," this witness reported that Corbett on one occasion said that if "he ever did something, it would be for a large amount of money — that he would never have to do it again."

Another co-worker of Corbett's at the paint plant stated that Corbett had told him about "his trips back into the hills," how he liked to go down through old gold mines and also hunt for small game near Central City and the Air Force Academy, and that on one occasion he [Corbett] had seen a large bear with a maimed foot or paw somewhere near the Academy premises.

This same witness testified that both he and Corbett were anxious to "acquire a large sum of money" and that they had on occasion discussed ways and means of accomplishing such. In this regard Corbett was reported to have said that he had been "planning something several years, two and one-half years, something very big — [that] it was not legal." Corbett also reportedly declared that "it would have to be several hundred thousand dollars to a million or it wouldn't be worth the risk, and that he [Corbett] had attempted to go into the venture the previous summer — that would be the summer of 1958 — [but] that something backfired during that time and he wasn't able to accomplish the fact." Also, according to this witness, Corbett owned a .22 rifle and a hand pistol.

Finally, this same witness testified that once when he and Corbett were drinking some Coors beer Corbett "mentioned something about the Coors strike and the family, how the business was completely owned by the family . . . that there were three sons, and, I believe, a daughter . . . that there was an Ad Coors, Jr. and the old man Mr. Adolph Coors."

Testimony was adduced which established that Corbett purchased a K-2 Smith and Wesson revolver in June 1957; thereafter bought some navy hand and leg irons in March 1959; and finally obtained four pairs of handcuffs on April 25, 1959. In each instance this merchandise was purchased from a mailorder company in the East and shipped to Corbett, then using the name Osborne, in Denver.

As of February 9, 1960, Adolph Coors III, together

with his wife and four children, resided in the country near Morrison, Colorado, their home being situate a mile or so to the south and west of a bridge known as Turkey Creek bridge. It was established that Turkey Creek bridge is not a part of any main or arterial highway, but rather is situate on a secondary road well off into the surrounding foothills. The Coors family had resided in this particular place since July 1958, when the family had moved to this location from South Denver. Coors was last seen alive by his wife at about 8 o'clock on the morning of February 9, 1960, at which time Coors left his home in an Inernational Travel-all station wagon to go to his place of business in nearby Golden.

At about 10 o'clock A.M. on that same morning a milkman making his daily deliveries attempted to cross the aforementioned Turkey Creek bridge, but could not do so because his passageway was completely blocked by a Travel-all station wagon, which was stopped on the bridge with the motor running and the car radio playing. The milkman honked his horn in an effort to attract the driver back to the stopped vehicle, but getting no response thereto he next proceeded to move the station wagon so that he might cross the bridge. About one hour later, this same milkman, having completed his deliveries, returned to the Turkey Creek bridge and found the Travel-all in the same location where he had previously placed it. He then proceeded directly into Morrison and reported the incident to the State Highway Patrol.

As a result of this report a state highway patrolman at 11:17 A.M. on February 9, 1960, received a call to check an abandoned car at the Turkey Creek bridge. Upon arrival at the bridge the patrolman found the Travel-all in the location where it had been placed by the milkman and he observed that the registration card on the steering wheel post listed the name of the owner as "A. Coors." This patrolman also found two hats afloat in the water of Turkey Creek, both being about

three to four feet east of the east edge of the bridge. One of these was a baseball-type cap, which was subsequently identified as belonging to Coors. The other hat was a brown felt hat, size 7⅜, with the words "May Co." stamped on the inside band.

At about 11:40 A.M. the state highway patrolman left the Turkey Creek bridge area and proceeded into Morrison, where he caused William and Joseph Coors, brothers of Adolph, to be telephonically notified that Adolph's Travel-all had been located. This call was received by the Coors brothers at about 12:15 P.M. on February 9, 1960, and they immediately proceeded to Morrison. There they met the state highway patrolman who then led them to the Turkey Creek bridge, all arriving at the bridge about 12:45 P.M. Thereafter, representatives of the Sheriff's office first arrived at the Turkey Creek bridge at about 1:15 P.M.

The testimony of the milkman, the state highway patrolman, the Coors brothers and the several representatives of the Sheriff's office established that there were blood stains on the west railing of the Turkey Creek bridge, and that immediately below these stains was a pool of blood, later definitely determined to be human blood. This pool of blood was located in the dirt and sand on the west side of the bridge proper, and most definitely was not microscopic in size, but of considerable proportion, all witnesses generally describing it as being about eighteen inches in length, eight inches in width and several inches in depth.

On this same day the water level in Turkey Creek proper was lowered and in the stream near the aforementioned bridge, eyeglasses were found which were later identified by Adolph Coors' ophthalmologist as being the same prescription as he had previously prescribed for Coors.

One witness who resided near the Turkey Creek bridge testified that at about 8 A.M. on February 9, 1960, she heard what she described as a "very loud

report, much louder than a .22 rifle or something that I have heard around the place." She further compared "it to lightning hitting a tree." On cross-examination she said she only heard one such shot, "unless these were two so close together that it sounded as one."

Another witness who resided about one and one-half miles to the east of Turkey Creek bridge testified that she was hanging out clothes about 8 A.M. on February 9, 1960, and that she too "heard a shot . . . the shot came from that direction — right from where the bridge is or around in that way."

Jumping ahead to about 2 P.M. on September 11, 1960, one Green, who was afoot in the open country some twelve miles to the south and west of Castle Rock searching for a place to do some target shooting, stumbled upon a pair of shoes, a pair of socks and some man's pants. He picked up the pants, and hearing a "jingling inside the pants pocket," decided to investigate further. In the pocket of this pair of pants Green found some keys and attached to the keyring was a small penknife carrying on its side the following engraving: "AC III."

Green quickly departed this scene and returned to his home in Englewood. He immediately reported his discovery to the FBI and in the late afternoon of that same day Green, accompanied by several agents of the FBI, returned to the aforementioned place and Green then proceeded to relocate the items of clothing for the FBI agents.

The next day, September 12, 1960, twenty-six FBI agents began a systematic search of the general area where these articles of clothing had been found. Suffice it to say that after a two and one-half day search numerous bones were located which were later identified by a medical expert as being the bone structure of a human body — a male about 6 feet in height who had been dead for about six months. A human skull was also discovered and a dentist, with the aid of his dental

records, identified the skull as that of Adolph Coors III.

The bones thus found constituted virtually the entire bone structure of a human skeleton. All were said to be normal, except for animal depredation, save the right scapula or shoulder blade. Parenthetically, it should be noted that there was testimony that there were wild animals in this general area, and one FBI agent testified that he observed a large bear, "apparently full grown . . . [with] a deformed paw." As for the right scapula, there were two "defects" or holes in this scapula which in the opinion of the pathologist were made by "objects passing through it [the right scapula] at high velocity." The pathologist expressed the opinion that "the location [of these defects] was such that . . . the soft tissue injury from an object passing in this location at a high velocity would inflict wounds of the chest which would be of themselves sufficient to cause death." He added that these objects would have entered the lung area of the human body, and that there would be both bleeding and shock.

An FBI firearms expert examined a jacket, shirt and undershirt found southwest of Castle Rock and which were identified as belonging to Coors. He found two holes in the back of the jacket, with two holes also being found in the same relative position in the back of the shirt and the undershirt. He testified that the location of these two holes would be "directly over the right scapula." He went on to testify that he tested the back of this jacket in the vicinity of these two holes for the presence of powder residue and found residue in such quantity as to indicate that "they were produced by a contact or near contact shot."

At this juncture it might do well to note that in our considered view the People were able to make out a rather convincing case that Adolph Coors III was dead, and that his death was the result of a criminal agency. Indeed, during the trial Corbett offered to "admit" that Adolph Coors III was dead, though continuing to sug-

gest that the People's evidence had not ruled out the reasonable possibility of "accidental death." Suffice it to say that the jury rejected this suggestion!

Continuing with our analysis of the People's evidence, the net effect of the testimony of some eight different witnesses quite definitely established that Corbett was indeed no stranger to the Turkey Creek bridge and its immediate environs. Before reviewing this line of testimony, it is well to note that it was shown that until December 23, 1959, Corbett owned a 1957 two-tone gray Ford Club Fairlane. On that date Corbett sold this car to a used car dealer in Denver for $900, Corbett at the time stating that he had quit his employment with the paint company and "was going back to school."

On January 9, 1960, Corbett, however, bought from another used car dealer in Denver a 1951 Mercury, yellow colored, and it was shown that this particular vehicle was issued a 1960 Colorado license plate bearing the following license number: "AT-6203."

Evidence disclosed that a mine known as Uranium Enterprise, situate on the so-called Mann Lease, was located about 125 feet from the Turkey Creek bridge. One Pace, who owned and on rather infrequent occasions was working this mine in December 1959, testified that he was at the mine on December 9, 1959, and at about 8 o'clock in the morning on that date a "gray off-white color" Ford stopped in front of the mine shack and its driver "got out and came down and talked to me for approximately twenty to twenty-five minutes." Pace positively identified this person who thus engaged him in conversation as Corbett, basing his identification on "facial features and height," plus the fact that this person "had an occlusion in his two front teeth." According to this witness, Corbett asked him "if I was working the mine" and "I said that I was part-time, weekends and nights." Corbett also reportedly asked how deep the mine was, where the Four Corners Mine was, whether the road which crossed Turkey Creek went

to Deer Creek and he was informed by Pace that no target shooting was permitted in the area because "from 285 to Deer Creek was a game reserve."

Pace's wife testified that she came to the mine on the morning of December 9, 1959, with a message for her husband and that when she arrived he was talking to Corbett. She described Corbett's car as a two-tone grey Ford.

Virginia Massey, a waitress who worked in Denver but lived near Morrison, testified that she crossed this Turkey Creek bridge twice daily. She stated that on February 6, 1960, at about 4:30 P.M. she had occasion to cross this bridge enroute to work and that on this occasion she saw a "yellow car" pulled into a "cave" some thirty-five feet from the bridge. She stated that she slowed down and noted a man standing by the "yellow car" and "I looked down at him and he looked at me." She identified this man as Corbett.

Mr. Massey, husband of Virginia, testified that at the time he and his wife resided near Morrison, he was running a small farm, and that on February 8, 1960, at about 8 o'clock in the morning he was enroute to Willow Springs Ranch to buy some feed and had occasion to traverse the Turkey Creek bridge. On this occasion he espied "in a small excavation just before you come to the bridge" a 1951 four-door yellow-colored Mercury automobile and that there was a bespectacled man in the car wearing an "ordinary brown businessman's hat" and that he had seen this same car in this same location on three prior occasions. He testified that he noticed that the license plate on this car was a 1960 Colorado plate, bearing the letters "AT," but that he could not recall the numbers.

One Cable, part-time watchman at the aforementioned mine on the Mann Lease, testified that he was on the job on February 8, 1960, and on that morning at about 8 A.M. he saw a 1951 yellow Mercury with a black top parked in the bridge area and that he made a mental

note that the vehicle bore 1960 Colorado license plates and that the two letters and first two figures on the plate were "AT-62."

Mrs. Cable corroborated her husband's testimony stating that she had accompanied him to the mine and that she saw this "yellow Mercury, 1951, with a black top, parked about 100 feet from the bridge."

Finally, a woman employee of the Colorado School of Mines testified that she crossed this Turkey Creek bridge daily and that in this area she saw a "yellow cream car . . . three mornings in a row about a week before this happened."

In the days immediately following February 9, 1960, Mrs. Adolph Coors III received some twenty so-called "ransom notes," the ransom note first received by her reading as follows:

"Mrs. Coors:

"Your husband has been kidnaped. His car is by Turkey Creek. Call the police or F.B.I.: he dies.

"Cooperate: he lives.

"Ransom: $200,000 in tens and $300,000 in twenties.

"There will be no negotiating.

"Bills: used/non-consecutive/unrecorded/unmarked.

"Warning: we will know if you call the police or record the serial numbers.

"Directions: Place money & this letter & envelope in one suitcase or bag. Have two men with a car ready to make the delivery. When all set, advertise a tractor for sale in Denver Post section 69. Sign ad King Ranch, Fort Lupton. Wait at NA 9-4455 for instructions after ad appears. Deliver immediately after receiving call, any delay will be regarded as a stall to set up a stakeout.

"Understand this: Adolph's life is in your hands. We have no desire to commit murder. All we want is that money. If you follow the instructions, he will be released unharmed within 48 hours after the money is received."

As we mentioned, the letter set forth verbatim, supra, was the first "ransom note" received by Mrs. Coors, and it bore a Denver post office postmark of "February 9, 1960, 3 P.M." A postal inspector explained that this marking established that this letter was canceled in the post office some time between 2:30 o'clock and 3 o'clock P.M. on February 9, 1960, and that it had most definitely been delivered to the postal station before 3 o'clock P.M. on February 9, 1960, and could have been delivered as early as noon of that same day. There was some evidence that there was no public disclosure of the disappearance of Adolph Coors III until approximately 5 o'clock P.M. on February 9, 1960. Be that as it may, this was the only ransom note received by Mrs. Coors which bore either a postmark of February 9, 1960, or was delivered to the Morrison post office on February 10, 1960. According to expert testimony this particular ransom note was typed on Eaton's Diamond White Bond Berkshire paper by one using a Royalite portable typewriter.

A witness who clerked in a local Denver dry goods store identified Corbett as one who purchased from her in December 1959 Berkshire Bond paper manufactured by the Eaton Company, the witness stating that she was "almost positive" in her identification — though not "absolutely positive" — and then went on to explain why she was "almost positive."

Another witness who clerked at another Denver mercantile establishment testified that on October 8, 1959, he sold a Royalite portable typewriter to a person who gave his name as "William Chiffins, 1735 Pennsylvania," a written record of this sale having been made by the clerk on the basis of information given him by this purchaser. This clerk then proceeded to identify Corbett as the person who bought this particular machine under the name of "Chiffins." By other evidence it was clearly established that no person with the name of "Chiffins" ever lived at 1735 Pennsylvania Street.

For the period of time from 1956 to February 10, 1960, Corbett lived by himself in an apartment in the Capitol Hill area of Denver. On February 10, 1960, Corbett went out the back door of the apartment house and in so doing inadvertently locked himself out. To get back into the premises he had to ring the front doorbell, which he did, whereupon the manager of the apartment house let him in. It was apparently on this chance occasion that Corbett for the first time informed the manager that he was immediately vacating his apartment, even though his rent was paid in full for the entire month of February, and he explained that he intended to go to college. The apartment house manager stated that she informed Corbett that if she was able to re-rent the apartment he would then be entitled to a rental refund, but that she never again heard from him in this regard. Corbett left several articles of furniture, plus his TV set, also with the understanding that the manager would try to sell them to the new occupant of his apartment.

The apartment house manager, and several tenants variously described Corbett as a "good tenant," quiet, reserved, and one who kept to himself. Several mentioned that Corbett was able to type, using the touch system rather than the "hunt and peck" method. It was established that while residing in the location he owned an upright Underwood typewriter. Finally, one tenant said she saw Corbett getting into his 1951 yellow Mercury automobile on the morning of February 10, 1960, and she particularly noted that the car was spattered with mud.

In connection with the Underwood typewriter, it was shown that in 1956 such a make typewriter, bearing serial No. 226886, was sold to Corbett, and that this identical typewriter was found on November 28, 1960, some forty or fifty feet off a road in the open country near Castle Rock.

After vacating his apartment on February 10, 1960, Corbett, insofar as the record reveals, disappeared and

was next seen in Toronto, Canada, on February 21, 1960. There he rented a room and remained until August 31, 1960, when without notice he left, leaving behind, according to his landlord, "everything which he had, like his clothing, books, screwdrivers, chain, whatever he had — he left everything."

Corbett was not seen again until October 29, 1960, at which time he was arrested by agents of the Federal Bureau of Investigation in Vancouver, British Columbia. The arresting agent testified that as he came upon Corbett he asked: "Are you Joseph Corbett, Jr.?" To this Corbett reportedly replied: "I'm your man. I give up. I'm not armed." Though Corbett had no weapon on his person, he did have a loaded gun in his suitcase in his room.

Corbett was subsequently questioned extensively by various investigating officers, but he declined to answer any questions concerning the death of Adolph Coors III. He did, however, admit that the hat which he had when arrested was purchased by him in Canada. The head size of this hat was 7⅜.

Backtracking to February 17, 1960, the Atlantic City, N. J., Fire Department on that date received a call that an automobile was afire in a dump area in that city. Responding to this call, it was determined that a 1951 yellow Mercury was ablaze. A subsequent check of the serial number of the burning vehicle disclosed that this was Corbett's car. The battalion chief of the department testified that the interior of the car was badly burned, that the odor of gasoline was easily detected, and that the fire was obviously the result of arson.

■ The foregoing summary of the evidence, voluminous as it may be, is by no means all of the incriminating facts and circumstances offered by the People. However, it is deemed sufficient to convince even the most doubting Thomas that Corbett is not the innocent victim of circumstances. In short, the record, in our considered view, sets forth a "concatenation of circumstances" of

such quality and quantity as to amply support the verdict of the jury and the judgment entered thereon.

It is axiomatic that any determination as to whether the facts and circumstances of a particular case are sufficient to support a guilty verdict in a criminal proceeding necessarily depends upon the nature and extent of the evidentiary matter as disclosed by the record. Instances where a murder conviction based primarily — if not exclusively — on circumstantial evidence has been upheld on review when subjected to the charge that the evidence was insufficient are as follows: *Edwards v. People,* 151 Colo. 262, 377 P. (2d) 399; *O'Loughlin v. People,* 90 Colo. 368, 10 P. (2d) 543; *Gould v. People,* 89 Colo. 596, 5 P. (2d) 580; *Blanda v. People,* 67 Colo. 541, 189 P. 249; and *Martinez v. People,* 63 Colo. 347, 166 P. 241.

Proceeding then to a consideration of some, but not all, of the remaining 102 errors allegedly committed during the trial of this case, it is noted that on December 12, 1960, Corbett filed a motion to set bail alleging that he was entitled to bail as a matter of right for the reason that "there is no evidence which would in anywise implicate or involve . . . [him] with the crime charged, other than limited circumstantial evidence . . ." This motion came on for hearing on December 27, 1960, and after legal argument was denied by the trial court.

On January 23, 1961, six weeks before the commencement of the trial proper, Corbett instituted in this Court an original proceeding which he labeled as one "in the nature of Mandamus, Certiorari and Habeas Corpus," whereby he sought review, among other things, of the action of the trial court denying his motion for bail. This petition was denied.

Corbett now contends that the trial court erred in denying his motion for bail and that such error requires a reversal of his conviction.

■ In *O'Brien v. United States,* 25 F. (2d) 90, the Seventh Circuit Court stated: "As to the complaint of

excessive bail we do not think error is properly assignable thereon. If the bail is deemed excessive, relief may be sought by suitable proceedings, but not through writ of error after conviction of the crime charged."

To the same effect, see *Hewitt v. United States,* Eighth Circuit Court, 110 F. (2d) 1.

In *State v. Sheppard,* 100 Ohio App. 345, 128 N.E. (2d) 471, the Court of Appeals of Ohio said: "The first claim of error based on the failure of the court to admit the defendant to bail must be overruled. This was a question resting in the exercise of a sound discretion by the trial court. The evidence produced at the hearing of defendant's request for bail has not been brought into the record before us. *In any event, such ruling cannot now be raised after trial and conviction.*" (Emphasis supplied.)

In *Bozovichar v. State,* 230 Ind. 358, 103 N.E. 680, the Indiana Supreme Court in reviewing before trial the propriety of an order of the trial court denying a motion for bail, observed that "if the decision is not reviewable before trial and sentence under the indictment it is never reviewable," and citing as authority therefore *O'Brien v. United States,* supra.

Accordingly, Corbett's contention that his conviction should be reversed because the trial court improperly denied his motion for bail is held to be without merit.

Pursuant to C.R.S. '53, 39-9-4 and 5, Corbett filed a motion for a change of venue or in the alternative for a continuance of the trial date, alleging as grounds therefor his belief that he could not obtain a fair and impartial trial in Jefferson County because of the status and position occupied by the deceased in that county and also because newspaper, radio and television publicity had created "widespread hostility" towards him. This motion was supported by voluminous clippings primarily from the Denver newspapers and also by numerous affidavits, in response to which many counteraffidavits were thereafter also filed. On this state of the

record the trial court denied the motion and Corbett now urges this to be reversible error.

In *Abshier v. People,* 87 Colo. 507, 289 P. 1081, it was said:

"The granting or refusal of a motion for change of place of trial is one of the many matters wisely lodged in the discretion of the trial court, and in the absence of abuse, the order will not be disturbed.

"The fact that the deceased was a banker and citizen of high standing in the community, is not in itself a ground for change of venue. That he was such is admitted, but we accept the judgment of the trial court, indicated by its ruling, that the high esteem in which the citizens held the deceased, or any other matter, did not serve to prevent defendant from having a fair and impartial trial. Defendant's counsel produced numerous newspaper clippings from papers published in the cities of Denver, Pueblo, Colorado Springs and Lamar, all denunciatory of the crime, as well they might be . . . It might be said that the articles published outside of Prowers county were even more vehement than those inside the county, and if defendant should be permitted a trial where the news of the crime had not spread, he would doubtless have to go free. It does not appear from the voir dire examination of any juror who served, or otherwise, that his mind was inflamed or biased by the newspaper articles. . . ."

In determining whether a trial court abused its discretion in denying a motion for a change of venue because of alleged local prejudice, the reviewing court may quite properly look at what occurred upon voir dire examination of the prospective jurors. See *Martz v. People,* 114 Colo. 278, 162 P. (2d) 408, and *Giacomozzi v. People,* 72 Colo. 13, 209 P. 798. A review of the voir dire examination in the instant case convinces us that there was no such local prejudice as to necessitate a change of venue to insure that Corbett receive a fair and impartial trial.

The factual situation, as to possible local prejudice, is significantly different than that in *Irvin v. Dowd,* 366 U.S. 717, 81 S. Ct. 1639, strongly relied on by Corbett. All things considered, the trial court committed no error in denying the motion for a change of venue or, alternatively, for a continuance.

■ Corbett also contends that because of numerous and repeated rulings of the trial court he was virtually hamstrung in the preparation of his defense and that both before and during trial he was improperly thwarted in his "discovery" efforts. Specifically, in this regard he complains as follows: (1) subsequent to the filing of the information the trial court permitted the district attorney to endorse numerous persons as additional witnesses for the People (a matter uniformly held to rest within the sound discretion of the trial court); (2) prior to trial he was denied the right to review the FBI investigative report regarding the death of Adolph Coors III; (3) the People's witnesses declined to discuss their proposed testimony with his counsel prior to trial; (4) a subpoena duces tecum served on the agent in charge of the Denver office of the FBI was improperly quashed; and (5) the trial court refused to grant all of his various and sundry requests for appointment of expert witnesses and for a travel allowance to permit counsel to attempt to interview those witnesses for the People who resided outside the state. These various contentions have been reviewed and are deemed to be without merit.

■ "Discovery" as the word is used in the field of civil procedure is virtually non-existent in the field of criminal procedure. Under existing rules Corbett had no *right* to examine the FBI report as a part of his preparation for trial, nor did the persons endorsed as witnesses for the People have any *duty* to disclose to Corbett's counsel what their testimony would be. In this regard, in *People v. Spinuzzi,* 149 Colo. 391, 369 P. (2d) 427, we disapproved an order of the trial court that the People's witnesses must discuss "their testimony with

defense counsel under penalty of not being permitted to testify if they did not do so" and in so doing stated "that there is no authority . . . to exclude the testimony of a witness for the People because he refused to discuss his testimony with defense counsel."

Corbett claims that the reason given by most of the People's witnesses for refusing to discuss the matter with his counsel was that they had been thus "ordered" by the district attorney. The district attorney denied issuing any such "order" and states that he simply advised the prospective witnesses that they were under no compulsion to discuss the case or their testimony with others. The record in our view fails to disclose any such "order" of the district attorney and the refusal of the People's witnesses under the circumstances to "tell all" to Corbett's counsel is not grounds for reversal.

During the course of the trial proper Corbett caused to be served upon the agent in charge of the Denver office of the FBI a subpoena duces tecum, commanding him to appear in court three days hence as a witness for the defendant and also ordering the "witness" to bring with him voluminous documentary matter, including but not limited to the following: the FBI report concerning the death of Coors, all fingerprints "from all physical objects examined by the . . . [FBI] . . . in connection with the Coors case," all soil samples, all paint scrapings, all hair samples, all typewriters examined by the FBI, all ransom notes, all guns, slugs and ballistic reports, all blood samples, and "all physical objects, materials, instruments and things relating to or in anywise pertaining to the disappearance of Adolph Coors III on February 9, 1960." The foregoing descriptive language is deemed to demonstrate the "shotgun" characteristic of the subpoena, which clearly was of the "fishing type" variety.

■ The trial court upon motion quashed the subpoena duces tecum on the grounds that it was "impossible to produce [such] at this late hour," though order-

ing the person so served to nevertheless appear in court and be available to be called as a witness for Corbett. However, when the People rested its case, Corbett elected to stand on his motion to dismiss and determined to call no witnesses in his behalf, let alone the agent in charge of the local FBI office. On this state of the record Corbett cannot now predicate error on the quashing of his subpoena duces tecum, he being unable to show any prejudice in connection therewith.

In other words, Corbett had *no right* to see and examine the requested documents *by way of discovery,* be it before or during trial. Nor under the circumstances was the agent in charge of the Denver office under any *duty* to disclose anything to Corbett's counsel before or during the progress of the trial proper. Such in nowise impinges upon the admitted right of Corbett to call the agent in charge as his witness and through questioning demonstrate, if he could, the materiality and relevancy of the documents in question and, if able to demonstrate such, then demand their production in open court. This point was never reached, however, because Corbett for reasons best known to himself chose not to call the agent in charge as his witness.

The foregoing by no means touches upon all of the variety of error allegedly committed by the trial court during the course of the trial, but in our view does dispose of the more basic problems posed by this writ of error. To comment upon all of Corbett's assignments of error would serve no good purpose and only extend this already lengthy opinion to one of book-like proportions. Suffice it to say all alleged error has been considered and found to be untenable or without merit.

In closing, we quote the following language in *Walker v. People,* 126 Colo. 135, 248 P. (2d) 287:

"Perhaps no trial of any extended duration is wholly free from irregularity in some respects, but only mistakes that materially and substantially affect a litigant's legal rights, and are prejudicial to his cause, justify

reversal of the judgment . . . If it be not prejudicial error, then it is not error in law. In this case, while many errors are alleged to have been committed during the course of trial, after searching the record we find none that could reasonably be said to have jeopardized, prejudiced or substantially affected the rights of the defendant. Defendant was represented by able and zealous counsel who labored faithfully in behalf of his cause; he had a fair trial before an impartial judge and jury; he was found guilty of a revolting senseless murder; there is nothing before us that justifies our interference with the judgment of the trial court . . ."

The judgment is affirmed.

MR. JUSTICE DAY and MR. JUSTICE HALL dissent.